---

NO. 23-40683 consolidated with No. 25-40038

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff - Appellee

v.

MARIUS LAZAR,
Defendant-Appellant

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
[Cause No. 1:20-CR-00078]

---

BRIEF OF APPELLANT

---

John T. Hunter
State Bar No 24077532
HUNTER, LANE & JAMPALA
711 Navarro Street
Suite 235– Travis Park Plaza
San Antonio, Texas 78205
(210) 202-1076
(210) 880-6162 (*telecopier*)

Attorney for Appellant

*Oral Argument Requested

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

District Court Judge: **The Hon. Marcia A. Crone**

Appellant: **Marius Lazar**

Counsel for Appellant at Trial:
**Michael Babb**
Jbabb Law
800 E. Campbell Rd
Ste 300
Richardson, TX 75081

**Donald H Flanary, III**
Flanary Law Firm, PLLC
One International Center
100 NE Loop 410, Suite 605
San Antonio, TX 78216

**John T. Hunter**
HUNTER, LANE & JAMPALA
711 Navarro Street
Suite 235– Travis Park Plaza
San Antonio, Texas 78205

Counsel for United States:
**Christopher Thomas Rapp**
(trial and appellate counsel)
**Bradley E Visosky**
(trial and appellate counsel)
Assistant U.S. Attorneys
 Plano, Texas.

*/s/ John T. Hunter*
State Bar No 24077532

i

## <u>REQUEST FOR ORAL ARGUMENT</u>

Appellant respectfully requests oral argument. This case concerns a voluminous record with several complex factual and procedural issues pertaining to extraterritorial jurisdiction and RICO. For these reasons, Counsel respectfully suggests that oral argument would assist this Honorable Court.

# TABLE OF CONTENTS

Certificate of Interested Persons.........................................................................i

Request for Oral Argument ..............................................................................ii

Table of Contents ...........................................................................................iii

Table of Authorities.........................................................................................v

Statement of Jurisdiction ................................................................................1

Statement of Issues..........................................................................................2

Statement of the Case .....................................................................................4

Statement of Relevant Facts ...........................................................................5

Summary of Argument....................................................................................9

ARGUMENT ................................................................................................10

Issue 1 .........................................................................................................11

Issue 2 .........................................................................................................22

Issue 3 .........................................................................................................27

Issue 4..........................................................................................................34

Issue 5..........................................................................................................41

Issue 6..........................................................................................................45

Issue 7..........................................................................................................49

Issue 8..........................................................................................................53

Issue 9 ............................................................................................... 57

Issue 10 ............................................................................................. 63

Issue 11 ............................................................................................. 64

Issue 12 ............................................................................................. 66

Issue 13 ............................................................................................. 67

Issue 14 ............................................................................................. 68

Issue 15 ............................................................................................. 69

CONCLUSION AND PRAYER ........................................................ 70

CERTIFICATE OF SERVICE ......................................................... 72

CERTIFICATE OF COMPLIANCE ................................................. 73

## ***TABLE OF AUTHORITIES***

*JUDICIAL OPINIONS:*

*Boyle v. United States,* 556 U.S. 938 (2009)................................................64, 65

*Crane v. Kentucky,* 476 U.S. 683 (1986) ......................................................33, 34

*Davis v. Alaska,* 415 U.S. 308 (1974) ...........................................................48, 22

*Edwards & Hanly v. Wells Fargo,* 458 F. Supp. 1110 (S.D.N.Y. 1978)........47

*Green v. United States,* 309 F.2d 852 (5th Cir. 1962) ....................................62

*Holmes v. South Carolina,* 547 U.S. 319 (2006)............................................48

*Jackson v. Virginia,* 443 U.S. 307 (1979) ......................................................48

*Kotteakos v. United States,* 328 U.S. 750 (1946)......................................50, 51

*Morgan v. Bank of Waukegan,* 804 F.2d 970 (7th Cir. 1986)........................65

*Northern Trust Bank. v. Inryco, Inc.,* 615 F. Supp. 828 (N.D. Ill. 1985) ....64, 65

*RJR Nabisco, Inc. v. European Community,* 579 U.S. 325 (2016)................13

*Rovario v. United States,* 353 U.S. 53 (1957)............................................ *passim*

*Salinas v. United States,* 522 U.S. 52 (1997) ..................................................51

*Sears v. United States,* 343 F.2d 139 (5th Cir. 1965).....................................52

*United States v. Age,* 136 F.4th 193 (2025) ....................................................45

*United States v. Al Kassar,* 660 F.3d 108 (2d Cir. 2011)...........................22, 23

*United States v. Archer,* 486 F.2d 670 (2d Cir. 1973) ............................24, 25, 26

*United States v. Carreon,* 11 F.3d 1225 (5th Cir. 1994)..................................68

*United States v. Bagnariol,* 665 F.2d 877 (9th Cir. 1991) .............................25

*United States v. Barboa,* 777 F.2d 1420 (10th Cir. 1985) .............................52

*United States v. Berger,* 224 F.3d 107 (2d Cir. 2000). ..................................50

*United States v. Bowens,* 224 F.3d 302 (4th Cir. 2000) .................................58

*United States v. Cabrales,* 524 U.S. 1 (1998) ............................................58, 59

*United States v. Carlton,* 442 F.3d 802 (2nd Cir. 2006) ................................52

*United States v. Chase,* 372 F.2d 453 (4th Cir. 1967) ...................................52

*United States v. Cordova-Soto,* 804 F.3d 714 (5th Cir. 2015)......................11

*United States v. Corson,* 579 F.3d 804 (7th Cir. 2009)...................................52

*United States v. Crenshaw,* 359 F.3d 977 (8th Cir. 2004) .............................54

*United States v. Davis,* 905 F.2d 245 (9th Cir. 1990) ....................................22

*United States v. De Los Santos,* 810 F.2d 1326 (5th Cir. 1987) ....................35

*United States v. Delgado,* 672 F.3d 320 fn. 19 (5th Cir. 2012) .....................52

*United States v. Dvorin,* 817 F.3d 438 (2016) ...............................................28

*United States v. Ebron,* 683 F.3d 105 (5th Cir. 2012) ...................................41

*United States v. Escobar de Bright,* 742 F.2d 1196 (9th Cir. 1984)..............52

*United States v. Esquivel,* 755 F. Supp. 434 (D.D.C. 1990) ..........................47

*United States v. Garrett,* 238 F.3d 293 (5th Cir. 2000) .................................28

*United States v. Garrett,* 716 F.2d 257 (5th Cir. 1983) .................................25

*United States v. Greer,* 137 F.3d 247 (5th Cir. 1998)....................................48

*United States v. Guerrero,* 813 F.3d 462 (2d Cir.) .....................................17, 18

*United States v. Keller,* 916 F.2d 628, 636 (11th Cir. 1990) ........................ 3, 63
*United States v. Kragness,* 830 F.2d 842 (8th Cir. 1987) ............................. 13
*United States v. Lawrence,* 727 F.3d 386 (5th Cir. 2013) ............................ 20
*United States v. Lopez,* 514 U.S. 549 (1995) .......................................... 54
*United States v. Lopez-Vanegas,* 493 F.3d 1305 (11th Cir. 2007) ................. 27
*United States v. Maldonado,* 735 F.2d 809 (5th Cir. 1984). .......................... 35
*United States v. Mandujano,* 499 F.2d 370 (5th Cir. 1974) ......................... 66
*United States v. McMillan,* 600 F.3d 434 (5th Cir.) ................................. 14, 63
*United States v. Meacham,* 626 F.2d 503, 509 (5th Cir. 1980) ...................... 66
*United States v. Morrow,* 177 F.3d 272 (5th Cir. 1999) ............................. 20
*United States v. Moss,* 591 F.2d 428 (8th Cir. 1979) ................................. 52
*United States v. Nascimento,* 491 F.3d 25 (1st Cir. 2007) .......................... 54
*United States v. Norris,* 217 F.3d 262 (5th Cir. 2000) .............................. 42
*United States v. Nunez,* 889 F.2d 1564 (6th Cir. 1989) .............................. 52
*United States v. Phillips,* 219 F.3d 404, 409 (5th Cir. 2000) ....................... 48
*United States v. Rodriguez-Moreno,* 526 U.S. 275 (1999) .......................... 58
*United States v. Ruggiero,* 726 F.2d 913 (2nd Cir. 1984) ........................ 50, 51
*United States v. Sanchez,* 988 F.2d 1384 (1993) .................................... 34
*United States v. Sanders,* 966 F.3d 397 (5th Cir. 2020) .......................... 14, 20
*United States v. Scully,* 951 F.3d 656 (5th Cir. 2020) ............................... 11
*United States v. Smith,* 198 F.3d 377 (2d Cir. 1999) ................................ 58
*United States v. Snow,* 48 F.3d 198 (6th Cir. 1995) .................................. 19
*United States v. Solis,* 299 F.3d 420 (5th Cir. 2002) ................................. 60
*United States v. Thomas,* 348 F.3d 78 (5th Cir. 2003) ............................... 35
*United States v. Tombrello,* 666 F.2d 485 (11th Cir. 1982) ......................... 52
*United States v. Ulbricht,* 31 F. Supp. 3d 540 (S.D.N.Y. 2014) .................... 50
*United States v. Valencia,* 600 F.3d 389 (5th Cir. 2010) ............................ 42
*United States v. Vasquez,* 899 F.3d 363 (5th Cir. 2018) ....................... 17, 18, 20
*United States v. Villarini,* 238 F.3d 530 (4th Cir. 2001) ............................ 59
*United States v. Villarreal,* 963 F.2d 725 (5th Cir. 1992) ....................... 18, 19
*United States v. Vizcarra-Porras,* 889 F.2d 1435 (5th Cir. 1989) ................. 35
*United States v. Walker,* 142 F.3d 103 (2nd Cir. 1998) ............................. 18
*United States v. Wallace,* 85 F.3d 1063 (2d Cir. 1996) ............................. 23
*United States v. White,* 611 F.2d 531 (5th Cir. 1980) ............................... 62
*United States v. Yousef,* 327 F.3d 56 (2d Cir. 2003) ................................ 22
*Voest-Alpine v. Bank of China,* 142 F.3d 887 (5th Cir. 1998) ..................... 48
*Waucaush v. United States,* 380 F.3d 251 (6th Cir. 2004) .......................... 54

STATUTES AND OTHER AUTHORITIES:
18 U.S.C. § 1956(f) .................................................................. 60, 61
18 U.S.C. § 1956(i)(1)(B) ............................................................... 59

18 U.S.C. § 1961(5)........................................................... 13
18 U.S.C. § 1962 ........................................................... 4, 11
18 U.S.C. § 3238 ................................................................. 60
21 U.S.C. §§ 848(e)(1)(A)......................................... *passim*
USSG § 2S1.1(a)(1)........................................................ 68, 69

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

Appellant filed a timely notice of appeal.

# STATEMENT OF ISSUES

**Issue No. 1 – Count I of the First Superseding Indictment Failed to Plead the conspiracy to murder for hire in furtherance of drug trafficking pursuant to 21 U.S.C. § 848(e)(1)(a). The Court erred in reversing itself and holding to the contrary.**

**Issue No. 2 The Government failed to plead a sufficient jurisdictional nexus for the drug trafficking RICO predicates under Count I and, consequently, failed to plead such a nexus for the substantive drug trafficking conspiracy alleged in Count II because the jurisdictional elements were all artificially crafted by the Agent. This deprived Lazar his Constitutional Right to Due Process of Law.**

**Issue No. 3. The Trial Court erred in failing to strike the government's exhibits depicting his Wickr messages with the DEA Agent. This deprived Lazar his constitutional right to fully and fairly present a defense and his right to confront and cross-examine his accuser.**

**Issue No. 4 The Government and the Trial Court deprived the Defendant his constitutional right to compulsory process and his right to confront and cross-examine by untimely disclosing the existence and relationship with a confidential, participating informant and denying the Defendant's resulting motion for disclosure under *Rovario v. United States.***

**Issue No. 5 The trial court erred in receiving expert testimony under Rule 702 from a Government witness that summarized the criminal behaviors of members of the Hell's Angels Motorcycle Club in the United States without any explanation of whether those behaviors were also applicable to the Bucharest, Romania chapter of the Hells' Angels.**

**Issue No. 6 The Court erred in excluding Defense Exhibit 9, which would have placed in issue whether or not Lazar was acting in furtherance of the alleged criminal enterprise.**

**Issue No. 7 Fatal Variance The evidence at trial was legally insufficient to support a conviction on Counts I as it related to the drug trafficking predicates, and as to Count II – the drug trafficking conspiracy. The Government failed to prove that Lazar conspired with the New Zealand Hells Angels members; instead it proved that Lazar conspired with a federal agent, and also proved that members of the New Zealand Hell's Angels conspired with that same government agent.**

**Issue No. 8 The evidence was legally insufficient to establish that Lazar was a member of the criminal enterprise alleged and was also insufficient to establish the commerce element as required for a RICO Conspiracy as alleged in Count I of the First Superseding Indictment.**

**Issue No 9. Venue was Improper for Lazar's Money Laundering Conspiracy**

**Issue 10. The court's instructions constructively amended the indictment by inviting the jury to find the existence of the enterprise simply by virtue of the existence of the alleged conspiracy.**

**Issue 11. The Court's instructions impermissibly lessened the Government's burden of proof on Count I by turning one drug transaction into six constituent parts, thereby expanding the number of predicate offenses the jury could consider when determining whether the RICO conspiracy had reached an agreement on the requisite number of predicate offenses.**

**Issue 12. The court improperly charged the jury on the legal concept of attempted transports of monetary instruments in ts instructions on Count III. This constitutes a double inchoate offense, and it is not a criminal offense authorized by law.**

**Issue 13. The Court incorrectly calculated Lazar's drug quantity relevant conduct.**

**Issue 14. The Court incorrectly calculated Lazar's Role in the Offense.**

**Issue 15. The Court incorrectly calculated Lazar's money laundering offense level as a proceedings case rather than as a promotion case, which is what he was indicted and convicted of.**

## STATEMENT OF THE CASE

The indictment in this cause accused Marius Lazar of Racketeering Conspiracy pursuant to 18 U.S.C. § 1962(d) (Count I); Conspiracy to Import and Export Cocaine and to Manufacture and Distribute Cocaine Intending, Knowing and with the Reason to Believe that the Cocaine Will Be Unlawfully Imported into the United States pursuant to 21 U.S.C. § 963 (Counts II); and Conspiracy to Commit Money Laundering pursuant to 18 U.S.C. § 1956(h) & 18 U.S.C. § 1956(a)(2)(A)) (Count III); At a jury trial, Mr. Lazar was convicted on all counts. He filed a timely motion for new trial, which was denied.He was sentenced to 300 months imprisonment on Count I and II of the First Superseding Indictment and 240 months imprisonment on Count III of the First Superseding Indictment, with each count running concurrently. He filed timely notice of appeal, Mr. Lazar now seeks relief from this Honorable Court.

**STATEMENT OF FACTS**

Marius Lazar is a 51-year-old man from Bucharest, Romania. [ROA 2591], [ROA 7838]. Prior to his arrest and extradition to the United States, he had resided in Romania his entire life. [*Id].* Marius' interests and talents are wide reaching. He obtained a bachelor's degree in electronics and telecommunications from the Polytechnique Institute of Bucharest. He has a master's degree from the Chamber of Commerce in Austria. He worked in real estate, and also customized and sold Harley-Davidson Motorcycles. [ROA 2592]. He's been riding motorcycles since he got his driver's license at the age of eighteen. [ROA 2597]. His enthusiasm for motorcycles brought him to join the Romanian Hells Angels, where he served as the vice president of the Bucharest charter. [ROA 2629].

Biker clubs, including the Hells Angels, are different in Europe. [ROA 2600]. Stricter weapons laws mean that motorcycle clubs do not generally engage in widespread violence the way "outlaw" motorcycle clubs are perceived to do in the United States. [*Id*]. Lazar was unaware of any other Romanian Hells Angels who have been charged with drug dealing or violent offenses. [ROA 2612].

In 2020, Marius, who was caring for his aging father, encountered a situation where three masked men came to threaten and intimidate his father at his home. [ROA 2626]. Over time, Marius concluded that the men who threatened his father were members of a different motorcycle club in Romania called the Gremium. [*Id*]. Marius

tried to appeal to his motorcycle club for help, but they declined, suggesting Marius was paranoid. [ROA 2628]. Prior to the summer of 2020, Marius had never met anyone from the New Zealand Hells Angels. But in late July, Marius met a New Zealand Hells Angel at a bar in Bucharest by the name of Matthews. [ROA 2634].

Unbeknownst to Marius, the previous evening, Matthews and his cohorts from New Zealand had just finished a business meeting in Bucharest with a "cartel boss" where they had negotiated the purchase of 400 kilograms of cocaine for distribution in New Zealand. [ROA 1959]. As Lazar and Matthews talked about Lazars concerns for his father, Matthews decided that this "cartel boss" could possibly help Marius.

This "cartel boss" was an undercover agent with the United States Drug Enforcement Administration named Agent Diaz. While working the DEA tip line, Diaz had spoken to an incarcerated person in New Zealand who had advised him that he knew of people wanting to purchase bulk quantities of cocaine for distribution in New Zealand. This tip led Diaz to negotiations, in an undercover capacity, with another prisoner name Cui, who in turn connected Diaz with Matthews and Johnson, two members of the New Zealand Hells Angels. The record never definitively explains why Bucharest, Romania was chosen as the location for the Agent to meet with these New Zealand nationals. Diaz explained that he ran a base of operations out of Beaumont, Texas, where he had cattle ranches and industrial manufacturing operations. The cocaine would be imported from Peru to Beaumont, secreted in machinery at his base of operations, and then shipped out for distribution overseas.

When Lazar finally got in touch with Agent Diaz, he indicated that he had three individuals that he "wanted to put to sleep." [ROA 1960]. Diaz was at first reluctant to pursue this lead, as it could compromise the 400 kilogram cocaine purchase he'd just brokered with Matthews and Johnson. [ROA 1961]. Ultimately, however, Diaz agreed, and a lengthy series of discussions and negotiations ensured, largely over an encrypted messaging app called Wickr. Lazar also wanted to broker a deal to purchase ten kilograms of cocaine from Diaz, and discussed that with Diaz during the phone call about the murder in late July of 2020. While Matthews was on that call, there is little to support the Government's claim that Matthews is part of the negotiations as an actual party.

Diaz required Lazar to provide another undercover agent posing as a Romanian criminal with a pistol and a token sum of cocaine as bona fides that Lazar was not a police officer. [ROA 2111]. Lazar delivered these items – an antique pistol and a small amount of cocaine – to the undercover in Bucharest. [ROA 2123-24]. Although Diaz indicated concern that the murder plot may not be approved with by the Hells Angels, Diaz never probed for specific details as to whether permission from any hierarchical structure was necessary, whether it was part of the club's business, or whether it had anything to do with the Hells Angels. [ROA 2114]. Lazar indicated to Diaz he wanted to keep the killing private. [ROA 2115].

Although Matthews would ultimately volunteer the funds for the murder, and although the murder would eventually get whittled down to a single targeted person,

Diaz's dealings with the New Zealand Angels and Lazar were markedly different in terms of the scale of the operations involved and the ability of the New Zealand conspirators ability to come through on the financial promises they made to the Agent – wires totaling $629,182.00. [ROA 1893].

New Zealand Angels wired Diaz money for their cocaine purchase to banks in Houston and San Francisco. Lazar never wired any money to the United States. He struggled to finance the ten kilogram purchase he negotiated with Diaz, and Diaz spent a considerable amount of time trying negotiate means of paying for the drugs Lazar wanted to buy ranging from the sale of white tigers to arms trafficking. None of these ideas ever materialized past text messaging and photographs. When asked if Lazar was stringing him along, Diaz acknowledge that possibility. [ROA 2346].

Ultimately, Romanian and United States governments arrested Lazar and his alleged co-conspirators in Romania. Lazar was extradited to the United States. This is not a case where Lazar maintains that he did not engage in criminal activity. Lazar absolutely brokered a ten kilogram cocaine deal and solicited a murder in Romania. The question for this appeal is whether such conduct can be reached by the laws of the United States.

## SUMMARY OF ARGUMENT

The geographic reach of federal power resonates throughout this appeal. How far can the law of the United States fairly reach? How do cases that dance at that periphery function in a constitutionally sound manner? Where should such cases be prosecuted? Can jurisdiction for some aspects of a foreign defendant's conduct be used to bootstrap jurisdiction for other aspects? How far is too far when the government fabricates the factual basis for jurisdiction to achieve covert law enforcement objectives?

The Government maintains that Marius acted in concert with the "enterprise" of the Hell's Angels, thus triggering a RICO Conspiracy, a Money Laundering Conspiracy, and a Drug Trafficking Conspiracy for quantities of cocaine far exceeding what Marius personally negotiated for. The trial court accepted several tenuous representations by the Government concerning the operation of these laws as applied to the facts that bring us to this Honorable Court. Of particular concern is the question of whether the United States has extraterritorial jurisdiction over the alleged predicate acts Marius is said to have conspired to commit; whether his conspiracy actually concerned the Hell's Angels at all; whether the Hell's Angels of Romania, Bucharest Chapter, is even part of the same criminal enterprise as the Hell's Angels Motorcycle Club as it exists in the United States ("HAMC"), and whether venue for this trial was proper given that all of the criminal conduct alleged was brought into the ephemeral reach of federal extraterritoriality by the sheer force of a pure fiction crafted in the mind of an undercover narcotics agent.

9

The record on appeal establishes that, both in pleadings and in proof, the Government has here prosecuted a man for conspiring with someone he cannot legally conspire with, through an enterprise he plainly was not acting in concert with, for conduct that occurred exclusively in the foreign territory of a sovereign nation, without any nexus to the territory or interests of the United States, and was tried in a place of the Government's choosing without regard to the factual, constitutional, or legal soundness of that venue. The Government's pleadings failed to confer jurisdiction, the proof at trial was legally insufficient to establish the jurisdictional elements of the offenses alleged, and the proceedings deprived Lazar of those most basic Due Process protections that are the envy of every other free people on Earth. Much of the evidence offered by the Government was not relevant to the real human beings in Bucharest that make up the cast of characters in this story, and the jury was invited to entertain elisions of logic that far exceed what the law would accept as rational inferences. Other characters, central to the story, were kept in the shadows despite evidence of their direct participation in the offense conduct and their collusion with law enforcement. This Court should reverse his conviction on all three counts.

## ARGUMENT

### **Pleading Error**

**Standard of Review.**

Challenges to the indictment that raise pure questions of law or constitutional

challenges are governed by a *de novo* standard of review. *United States v. Scully,* 951 F.3d 656, 668 (5th Cir. 2020) (quoting *United States v. Cordova-Soto,* 804 F.3d 714, 718 (5th Cir. 2015)).

**Issue No. 1 – Count I of the First Superseding Indictment Failed to Plead the conspiracy to murder for hire in furtherance of drug trafficking pursuant to 21 U.S.C. § 848(e)(1)(a). The Court erred in reversing itself and holding to the contrary.**

**Procedural History of this Issue.**

Count I of the first superseding indictment charged Marius Lazar with a racketeering conspiracy under 18 U.S.C. § 1962(d). Specifically, the indictment alleged that Marius and others conspired to violate Section 1962(c) by agreeing to conduct and participate, directly and indirectly, in the conduct of the affairs of the Hells Angels enterprise through a pattern of racketeering activity. [ROA 1377-78]. The indictment then generically averred that those acts of racketeering consisted of "multiple: a. acts indictable under 18 U.S.C. § 1956 . . .; acts involving murder, chargeable under Tex. Penal Code §§ 1.04(a), 15.01, 15.02, 15.03, 19.02, and 19.03; and offenses involving trafficking in controlled substances, in violation of 21 U.S.C. §§ 848(e)(1)(a), 952, 953, 959, 960, and 963. [*Id*]. The indictment further alleges that it was part of this conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the enterprise's affairs. [ROA 1378]. Through the course of the pretrial litigation on the Lazar's Motion to Dismiss, the government represented

to the Court that "the Government does not intend to argue that the RICO . . . was based on any predicate offenses other than those listed in subparagraph (a) through (c) of paragraph 11 [of the First Superseding Indictment]. [ROA 788].

The indictment further alleges that Lazar and another person solicited "Person 1" (whom the Government conceded for pretrial litigation purposes was Agent Diaz of the DEA) to arrange the murder of three people in Romania. [ROA 1379-1381] (¶¶ 7, 8, 9, 11,13, 14, 17, 18, & 20). For the purposes of the Motion to Dismiss, and as it was established at trial, It is materially undisputed that this solicitation for murder occurred in Romania, while all the parties involved including the federal agent were physically in Romania, and that the subjects of the murder plot were all Romanian nationals living in Romania. The indictment also alleged special sentencing factors related to this solicitation to commit murder, all of which expressly recited the applicable provisions of the Texas Penal Code related to murder and criminal solicitation. [ROA 1385-86]. 21 U.S.C. § 848(e)(1)(A) is conspicuously absent from any paragraph that alleges this criminal solicitation to murder or invokes sentencing provisions related to it.

Marius filed a Motion to Dismiss the Indictment which argued, *inter alia,* that RICO applies extraterritorially only to the same extent that the alleged predicate acts themselves apply to international conduct, and that a solicitation to kill a foreigner, made in a foreign country, by a foreigner, to a United States agent, while all parties involved are outside Texas and the United States, cannot be reached by Texas' extraterritorial jurisdiction statute, Section 1.04(a) of the Texas Penal Code. [ROA 98-

99]; *RJR Nabisco, Inc. v. European Community,* 579 U.S. 325, 326 (2016). This conclusion must be reached when, as here, the pleadings (and, in fact, the proof) could not establish that any act necessary to complete the crime of solicitation actually occurred in Texas or in the United States.

The trial court agreed with Marius. [ROA 838-846] ("Accordingly, as Lazar frames this situation, this was a 'Romanian murder-for-hire plot to kill Romanian nationals in Romania.' Texas' territorial jurisdiction statute does not reach Lazar's conduct, and, as a result, the murder-for-hire plot is not punishable under Texas law. Thus, Texas' solicitation for murder offense cannot serve as a RICO predicate offense."). This conclusion would leave the government with only two remaining predicate offenses – the drug trafficking conspiracy and the money laundering conspiracy. 18 U.S.C. § 1961(5); *United States v. Kragness,* 830 F.2d 842 (8th Cir. 1987) ("We agree with the defendants that it is not proper under RICO to charge two predicate acts where one action violates two statutes.").

In a Hail Mary attempt, the Government argued in response to the Motion to Dismiss that the murder-for-hire plot was also alleged as a separate predicate act within the indictment under 21 U.S.C. § 848(e)(1)(A), and thus it could still be utilized as a RICO predicate offense. [ROA 659] (Government Response to Motion to Dismiss) ("Alternatively, even if Texas lacked jurisdiction over Lazar's plot to kill his rival, this conduct would still constitute racketeering activity because it would, **if completed,** constitute a violation of 21 U.S.C. § 848(e)(1)(A).")(emphasis supplied). The trial court

13

found this argument unpersuasive:

> In the absence of the Texas solicitation offense, the ***Government's intent with respect to its reference to § 848(e)(1)(A) is not entirely clear.*** Above all, however, to the extent that the Government wishes to support the murder-for-hire plot with § 848(e)(1)(A) such that the scheme still qualifies as a third predicate act – **its efforts are unavailing.** The First Superseding Indictment alleges three distinct predicate acts to support the RICO conspiracy. ***The second predicate act, relating to the murder-for-hire plot, is supported only by the Texas Penal Code solicitation offense.*** The third predicate act, regarding 'offenses involving trafficking in controlled substances,' is based upon violations of <u>21 U.S.C. §§ 848(e)(1)(A)</u>, <u>952</u>, <u>953</u>, <u>960</u>, and <u>963</u>. While **§ 848(e)(1)(A)** is alleged in the predicate offense section, it **is not alleged to support the murder-for-hire scheme as a predicate act on its own.** At this stage, **were the Government to attempt to support the second predicate act with § 848(e)(1)(A) at trial** (so that it could still prove the RICO conspiracy with any two of the three predicate acts alleged in the indictment), **such an effort would equate to a constructive amendment of the indictment.**

[<u>ROA 846-847</u>] (Trial court's order partially granting Lazar's Motion to Dismiss)(citing *United States v. Sanders,* <u>966 F.3d 397, 407</u> (5th Ci<u>r. 2020</u>); *United States v. McMillan,* <u>600 F.3d 434, 451</u> (5th Cir.), *cert. denied,* <u>562 U.S. 1006</u> (2010)). The Court ultimately held that, while the Government would be allowed to discuss the murder-for-hire plot as context for the conspiracy, it could not be used as a RICO predicate offense. [<u>ROA 849</u>].[1]

    The trial court's ruling placed the government in a significant bind. The

---

[1] The Defense objected to the use of the murder-for-hire plot in this limited, evidentiary capacity at the commencement of the jury trial [<u>ROA 864</u>; <u>ROA 1871</u>]. The objection was overruled, and the court granted a running objection. This is highlighted here because, in the wake of the court's subsequent rulings, the basis for the objection was moot, but it would of course become a cogent objection again should the Court agree with the trial court's original – and as Appellant has consistently maintained – correct ruling that the murder-for-hire plot could not be used as a RICO predicate under this Indictment.

government knew that it would have difficulties with the drug trafficking predicate offense because there was a massive discrepancy between the conspiracy the Kiwi Hells Angels negotiated with Agent Diaz – 400 kilograms – and the paltry 10 kilograms Lazar was negotiating with Agent Diaz. That discrepancy casts doubt on whether Lazar was actually a part of any drug trafficking conspiracy with any person legally capable of agreeing to commit same. Similarly, apart from Kiwi Matthews' seemingly unilateral decision to pay for the murder in conjunction with his 400-kilogram cocaine deal with Agent Diaz, the government knew that Lazar had never wired money or transmitted bitcoin or conducted any other financial transaction with Agent Diaz. [ROA 2480]. The Government *needed* the murder-for-hire to be a RICO predicate because it constituted the most concrete linkage between Marius Lazar and all the other criminal activity alleged in the indictment. Consequently, in the middle of the jury trial, the Government urged the trial court to reconsider its ruling on the matter. [ROA 867].

Largely, the Government seemed of the opinion that the trial court had failed to appreciate that the two-predicates requirement could be satisfied even though both of the predicates were drug trafficking offenses. [ROA 869]. Appellant respectfully suggests this briefing unnecessarily confused the issues. Assuming *arguendo* that the murder-for-hire plot *could* have been alleged as a drug trafficking offense, the Government's motion for reconsideration glosses over the fact that it did not make a constitutionally sound allegation to that effect in this indictment. Despite the fact that the Defendant had no notice the murder-for-hire would be used as a drug trafficking

predicate, the trial court' accepted the Government's invitation to reconsider the issue, and charged the jury that the murder-for-hire plot could be considered as a predicate offense for RICO under 21 U.S.C. § 848(e)(1)(A). [ROA 2795] ("The Court has reconsidered and already determined that that prior ruling was erroneous and the Court has conformed the instructions accordingly."). The Defense took exception to this ruling and objected to these additions to the jury instructions. [ROA 2795].

**What Does the Indictment Authorize?**

Count I, the RICO Conspiracy, alleges that the conspirators agreed to commit "**offenses** involving trafficking in controlled substances in violation of 21 U.S.C. §§ 848(e)(1)(a)[murder in furtherance of violations of 960(a)], 952 [importing drugs], 953 [exporting drugs], 959 (manufacture/distribution of drugs), 960 [prohibited acts of import, export, or shipment of drugs], and 963 [conspiracy to commit same]. The indictment never alleges that Lazar's solicitation to kill Romanians' was done in furtherance of a drug trafficking conspiracy. None of the allegations of the indictment that describe the murder-for-hire plot reference any statute in Title 21 of the United States Code.  Significantly, Count II of the indictment, which alleges the same drug trafficking conspiracy outlined in Count I, does not claim that the murder-for-hire plot was done in furtherance of that conspiracy. [ROA 1387].  Although the charging instrument contained three special sentencing factors, none of them referenced Section 848(e)(1)(A), all pertinent sentencing factors related to the murder-for-hire plot pertained to the Texas Penal Code, which the Court struck from the indictment.

**848(e)(1)(A) cannot be conspired to in the conventional way that other crimes can be.**

Although the circuits that have discussed this law often refer to it as a substantive criminal offense, there is something distinctly different about how 21 U.S.C. § 848(e)(1)(A) operates. It is essentially a sentencing statute because it does not get violated except in the course of committing other predicate offenses. *United States v. Vasquez,* 899 F.3d 363, 375 (5th Cir. 2018) ([L]iability under § 848(e)(1)(A)requires that the offender first 'engag[e] in' one of the predicate [drug trafficking] offenses."); *United States v. Guerrero,* 813 F.3d 462, 466 (2d Cir.) ("The statute requires the Government to prove that the defendant was engaged in a predicate drug offense at the time of the intentional murder."), *cert denied,* 137 S. Ct. 98 (2016).

The Government's construction of how 848(e)(1)(A) could ever operate in the way it suggests is peculiar, even tenuous. For one, what the Government claims it could alternatively argue on the face of the pleading in this case – and what the trial court ultimately accepted -  is that a defendant can (1) conspire to commit RICO by (2)conspiring that two predicate offenses will be carried out (3)one of which is a conspiracy to engage in drug trafficking which (4) specifically includes as the second RICO predicate a conspiracy to violate a punishment enhancement provision. This interpretation is hopelessly vague, and invites a reading of the statutory language that leads to an absurd result where inchoate ideas come together like an infinite regress of Russian nesting dolls. It is simply impossible to accept that a quadruple-inchoate offense could ever pass constitutional muster.

17

The plain language of the statute militates against this interpretation. The title of Section 848(e)(1)(A) is "Death Penalty." The language itself, being itself designed to authorize the most serious punishment afforded by law, draws a narrowing set of circumstances around its use:

> any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual **and such killing results**, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

Neither *Vasquez,* upon which the Government heavily relies, nor *Guerrero* involved the application the Government invites on this appeal. Both cases involved drug trafficking conspiracies where actual deaths occurred in furtherance of those offenses. *Vasquez,* 899 F.3d at 379-80; ;*Guerrero,* 813 F.3d at 464. Counsel has been unsuccessful in finding any prior precedent in any circuit court of appeal that have ever considered the question raised here – whether a person can be prosecuted solely for conspiring to kill someone in furtherance of a drug trafficking conspiracy under subsection (e)(1)(A) when no killing actually occurred.

Even cases which disagree with counsel's characterization of 848(e) as a penalty statute have not squarely considered whether 848(e)(1)(A), as a *substantive* criminal offense, can be conspired to. *Cf. United States v. Villarreal,* 963 F.2d 725 (5th Cir. 1992) (addressing substantive conviction for actual killing); *United States v. Walker,*

142 F.3d 103 (2nd Cir. 1998) (same).[2]

The only authority that appears to support the trial court's ultimate decision is *United States v. Snow,* 48 F.3d 198, 200 (6th Cir. 1995). That decision concerned a conviction for conspiracy to violate subsection (e)(1)**(B),** and its conclusion rests solely on the statutory interpretation of Section 846 of Title 21; in essence assuming that because the general drug conspiracy statute is purported to globally apply to all offenses in Title 21 and 848(e)(1) is a substantive offense, it must apply. *Id* at 201. This isn't persuasive reasoning.

Counsel respectfully contends that *Snow,* and any other decisions like it, that rely on *Villarreal* have taken this Court's language about subsection (e)(1) of Section 848 too far. Of course, definitionally, it describes a crime that is distinct from the drug trafficking offenses that trigger it. But to make that conclusion more broadly applicable to the issue of whether it can be conspired to is to ignore Congress' unusual choice to qualify the statutory text in terms of a killing that actually occurs. Such language is markedly different from almost every other criminal statute that can, by extension, be conspired to.

**Even if 848(e)(1)(A) can be the object of a 963 drug conspiracy and thus a RICO**

---

[2] This disagreement is largely a disagreement about vocabulary, not substance. Obviously, if the actor is engaged in the predicate criminal behavior and a killing results as described, it is a separate substantive crime, as *Villarreal* recognized for Section 848(e)(1)**(B)**. *Villarreal,* 963 F.2d at 728. But, as this Court held in that opinion, the crime is applicable only to certain class of criminal, and that class appears from the plain statutory text to encompass not simply those who conspire to commit drug trafficking offenses, but those who so conspire and in so doing kill or direct a killing that actually occurs. Other cases relied on by the Government in support of its contention do not directly concern 848(e)(1)(A) at all. *Cf. United States v. Echeverri,* 854 F.2d 638 (3rd Cir. 1988) (a continuing criminal enterprise case).

**predicate in its own right, that's not what the Government alleged, and the court's mid-trial self-reversal constructively amended the indictment.**

The Sixth Amendment promises the accused the right to be informed as to the nature of the charges against him. U.S. CONST. Amend VI. Rule 7(c)(1) requires the indictment to contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. PROC. 7. The indictment must contain enough detail to allow the Defendant to prepare his defense, recites the elements of the charged offense, and allows the defendant to rely on the Double Jeopardy Clause in future proceedings. *United States v. Lawrence,* 727 F.3d 386, 397 (5th Cir. 2013)(quoting *United States v. Morrow,* 177 F.3d 272, 296 (5th Cir. 1999). A constructive amendment of the indictment occurs when the Court permits a defendant's conviction on a factual basis that effectively modifies an essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than what was taken to the Grand Jury and alleged in the indictment. *United States v. Sanders,* 966 F.3d 397, 407 (5th Cir. 2020). Extraterritoriality and jurisdictional elements are essential aspects of the offense charged, and failure to correctly plead them subjects an indictment to dismissal. *Vasquez,* 899 F.3d at 371 (extraterritoriality is the proper subject of a motion to dismiss).

Nothing in the indictment could prepare Lazar for the idea that he would be tried, in part, on the issue of whether his murder-for-hire plot was a drug trafficking offense and thus a stand-alone RICO predicate under Count I. The government did not track the language of 848(e)(1)(A) anywhere in paragraph 11 of the First Superseding Indictment

or otherwise. It instead went to painstaking lengths to couch the murder-for-hire plot as a violation of Texas law; and it later admitted its reasons for doing so in an absurd attempt at an excuse for its pleading deficiencies:

> Given the way Congress drafted section 1961(1), the only way to allege section 848(e)(1)(A) as a predicate racketeering activity is the way the government did here. While a violation of 848(e)(1)(A) is undoubtedly an 'act involving murder' in the colloquial sense, it does not fall within section 1961(1)(A)'s category of 'acts involving murder' because that category is limited to state-law violations. The statute does not define a category of 'generic' federal murder like it does 'generic' state murder.

[ROA 872] (Government's Motion to Reconsider Court's Partial Grant of Defendant's Motion to Dismiss). This concession is telling. The Government alleged the murder-for-hire plot as a violation of Texas law, and only in the face of losing the predicate entirely did it try to resuscitate the theory through the lens of 848(e)(1)(A) as a stand alone offense. The Court erred in helping the Government effect this pleading maneuver. The Government's contention that because the statute number was listed in Count I, the Defendant received adequate notice is absurd. The Defense filed multiple briefs challenging the extraterritorial application of Texas law as applied to the murder-for-hire plot because that is how the Government theorized it's applicability to the RICO conspiracy. The Defense did not know it was trying a conspiracy to violate 848(e)(1)(A) as a predicate for a RICO conspiracy until half-way through the jury trial. The Sixth Amendment cannot tolerate such an ambush.

The harm caused by this error is beyond measure. The murder-for-hire plot was discussed in virtually every aspect of Agent Diaz's testimony, and Diaz testified for

days in a row about the nature of his communications with Lazar and others concerning the murder-for-hire plot and its logistics. The error extended past simply permitting the predicate to survive in the indictment and admitting evidence relevant to it; the Court also, over objection, charged the jury that it could consider the murder-for-hire as a drug trafficking RICO predicate. [ROA 2795-96]. By authorizing the jury to consider the plot as a possible RICO drug trafficking predicate, it is impossible to say beyond a reasonable doubt that the trial court's error in amending the indictment half-way through the trial did not have a significant impact on the outcome of the proceedings. The Court must reverse Marius's conviction.

**Issue No. 2 The Government failed to plead a sufficient jurisdictional nexus for the drug trafficking RICO predicates under Count I and, consequently, failed to plead such a nexus for the substantive drug trafficking conspiracy alleged in Count II because the jurisdictional elements were all artificially crafted by the Agent. This deprived Lazar his Constitutional Right to Due Process of Law.**

The Due Process Clause of the Fifth Amendment requires the government to establish a sufficient nexus between the criminal conduct and the United States before a criminal statute can be applied extraterritorially. *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011); *United States v. Yousef,* 327 F.3d 56, 86 (2d Cir. 2003) ("'[T]here must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrarily or fundamentally unfair.'" (quoting *United States v. Davis,* 905 F.2d 245, 248-49 (9th Cir. 1990))). In cases like *Yousef* and *Al Kassar,* this was a relatively simple threshold – these men intended concrete, physical harm to the United States and its citizens. But *Al Kassar* is instructive, as it discusses

the primary concern raised here – can a jurisdictional element be solely the product of the government's contrivance?

In *Wallace,* an opinion that strongly informs *Al Kassar's* analysis, the Court focuses on the concept of a failure in pleading or in proof to establish the jurisdictional element because the police supplied the jurisdictional element.  *United States v. Wallace*, 85 F.3d 1063, 1065 (2d Cir. 1996). While such a claim is theoretically possible, it could not help Wallace, much like it could not help *Al Kassar* because the defendants walked into the jurisdictional traps law enforcement had set for them. *Wallace*, 85 F.3d at 1067 (2d Cir. 1996)("'Although Citibank was introduced to the scheme only because of the FBI's actions, Wallace did indeed "execute a scheme ... to defraud ... Citibank."'").

But factual circumstances attendant to these decisions leave some questions unanswered. In *Al Kassar,* the defendants clearly had the idea of physically harming American interests and people as their objective, the Government's manufactured element only concerned giving the defendants a conduit for their primary objective. In *Wallace,* the crime was facilitated by law enforcement, but the Defendant directly seized that opportunity and effectuated the scheme. These facts give a significant reason not to conclude that the government's manufacture of the jurisdictional element was fatal to the prosecution – the actions and intentions of the defendants were always directed toward the United States. Marius Lazar, in contrast, was never interested in distributing cocaine in the United States, importing, exporting, or transshipping cocaine

through the United States, or in any way impacting, utilizing, or interacting with the United States. These features make Lazar's case squarely like the circumstances of the Second Circuit's seminal 1973 decision on jurisdictional entrapment/manufactured jurisdiction – *Archer.*

In *United States v. Archer,* federal agents decided to investigate corruption within the Queens County District Attorney's Office. Posing undercover, the agents fabricated a firearms case against an undercover, and then paid an assistant district attorney $15,000 to persuade a grand jury to no bill it. The government used the Travel Act to indict the "fixer" attorney and the prosecutor, a charge that rested entirely on the use of international and interstate telephone calls between the government agent (the phony "target" of the grand jury investigation") and the crooked criminal defense attorney. The calls were initiated by the federal agent using those telephone numbers solely to fashion the jurisdictional nexus for use of the Federal Travel Act. *United States v. Archer,* 486 F.2d 670, 674 (2d Cir. 1973). The Second Circuit noted that the phone calls were "a casual and incidental occurrence," and further that the use of these interstate and international telephone numbers "served no purpose that would not have been equally served by a call from New York; the [agent's physical location] was a matter of complete indifference to [the accused]." *Id* at 682-83. Recognizing that such duplicity in securing jurisdiction "is a reflection on the federal judicial system and brings it in to disrepute," the Second Circuit reversed Archer's conviction. *Id* at 682.

This Circuit has acknowledged the concerns raised in *Archer,* albeit with

qualifications. In *United States v. Garrett,* this court also considered a Travel Act bribery case, recognizing that the law "forbid[s] a government agent's movement out-of-state for the sole purpose of manufacturing . . . jurisdiction." *United States v. Garrett,* 716 F.2d 257 (5th Cir. 1983). This Court ultimately rejected *Garrett*'s manufactured nexus claim because the agent's out-of-state base of operations was preexisting and the defendant knew this fact and acted in accordance with it. *Id* at 267-68; *see also United States v. Bagnariol,* 665 F.2d 877, 896-99 (9th Cir. 1991) (government agent's out-of-state residence was not established solely to manufacture an interstate element, but was the consequence of a prior undercover operation). In short, these decisions narrow *Archer's* reasoning by demanding that the nexus was solely manufactured as a governmental contrivance, and did not serve any other legitimate aims of law enforcement.

The pleadings in this case, along with the Government's concessions during the course of the litigation surrounding Lazar's Motion to Dismiss, do not establish any legitimate secondary reason why the United States or Beaumont, Texas specifically were included in the DEA's fictional cover story for brokering cocaine deals in Romania. It was undisputed at trial and for the purposes of the motion to dismiss that the undercover agent began negotiations for the sale of cocaine for shipment to New Zealand. It is undisputed that the initial person negotiating with the agent was a Chinese national incarcerated in a foreign country. The indictment then alleges that a member of the New Zealand Hells Angels joined these negotiations. The indictment then alleges

that the Agent traveled to Romania to further negotiate the sale. At all points relevant to the indictment, the use of Beaumont, Texas, the import of cocaine to Beaumont for secreting same in heavy machinery for export to New Zealand, the business bank accounts where money was to be wired, and all other aspects of the case that demonstrate a nexus to the United States were fictionally supplied by the DEA Agent. Given that all of the ultimate objects of the conspiracy – Lazar's desire to purchase a relatively small amount of cocaine for sale in Europe; the Kiwi's desire to purchase a 400 kilogram quantity of cocaine for sale in New Zealand, the murder of Romanian nationals in Romania, and all other facets of the drug conspiracy touched and concerned totally foreign places and concerns. In Count II, the indictment explicitly details that the cocaine in question was to be sourced from Peru, not the United States. [ROA 1386-1387]. Hence, just as in *Archer,* the face of the pleadings themselves describe a conspiracy to import a foreign product to another foreign destination. The United States' involvement was purely a matter of indifference to all of the defendants. In one vitally important respect, the due process violation caused by this manufactured jurisdictional nexus is significantly *worse* than *Archer* or any opinion that has attempted to qualify its holding: in *Archer,* the telephone numbers used by the defendant truly were international or interstate. In this case, the Peruvian cocaine was a fiction, as was the need to import that cocaine to the United States for concealment and reshipment to New Zealand and Romania. The nexus here is purely a fabrication in the mind the DEA Agent.

The Government did not plead a sufficient jurisdictional nexus to the United States because its pleadings depend entirely on the fiction it created to secure the indictment in the first instance. That is not due process of law, and it cannot form a jurisdictional nexus to the United States. This impacts both Counts I and II of the First Superseding Indictment. As discussed *supra,* RICO cannot extend extraterritorially unless the predicates alleged in the indictment are extraterritorially applicable. The allegations in this case – and the proof at trial – do not trigger that necessary jurisdictional nexus for the drug trafficking predicate. *United States v. Lopez-Vanegas,* 493 F.3d 1305, 1313 (11th Cir. 2007) ("Congress has not stated its intent to reach discussions held in the United States in furtherance of a conspiracy to *possess* controlled substances *outside* the territorial jurisdiction of the United States, with intent to *distribute* those controlled substances *outside* of the territorial jurisdiction of the United States."). The trial court considered these arguments in the motion to dismiss stage of the proceedings and rejected them. [ROA 852]. The Court plainly erred, and this Court should reverse Counts I and II of the Indictment with instructions for their dismissal.

## Constitutional Harm Impacting the Discovery and Receipt of Evidence

**Issue No. 3. The Trial Court erred in failing to strike the government's exhibits depicting his Wickr messages with the DEA Agent. This deprived Lazar his constitutional right to fully and fairly present a defense and his right to confront and cross-examine his accuser.**

Rule 16 of the Federal Rules of Criminal Procedure requires the Government to produce to the Defense any relevant written or recorded statement of the defendant if

that statement is within the government's possession, custody, or control; and the government knows – or through due diligence could know – that the statement exists. FED. R. CRIM. PROC. 16(B)(i). Rule 16 also requires the government to permit inspection and copying of documents, photographs in the government's possession material to the defense, intended to be used in the government's case-in-chief, or obtained or belonging to the defendant. *Id* at (E).

Discovery violations are reviewed under an abuse of discretion standard on appeal. This Court must reverse if the Defendant can demonstrate that the violation prejudiced his substantial rights. *United States v. Dvorin,* 817 F.3d 438 (2016). When a discovery dispute raises the issue of sanctions, the Court should look to (1) the reasons why the disclosure was not made; (2) the amount of prejudice to the opposing party; (3) the feasibility of curing the prejudice by lesser remedies like a continuance; (4) any other relevant circumstances. *Id* (citing *United States v. Garrett,* 238 F.3d 293, 298 (5th Cir. 2000).

**Wickr and the Government's Production.**

This trial largely consisted of undercover DEA Agent Diaz taking the witness stand to authenticate and summarize a novel's worth of text messages sent and received by him with the various alleged co-conspirators over the summer of 2020. A substantial number of these messages were between Agent Diaz and Marius Lazar. To send and receive these communications, the Agent used an encrypted messaging app called Wickr me.  [ROA 1962] (Agent Diaz: "So we utilize an application it is called . . . Wickr

me. It's an encrypted end to end application and on that . . . you can utilize it just like a regular a phone text messaging and you can make telephone calls on the free service and that's what I had access to is the free service."); [ROA 2080] (discussing first Wickr correspondence with Lazar). The murder-for-hire plot was largely discussed over Wickr apart from a small number of telephone calls. [ROA 1868]. Diaz testified that Wickr has an auto-delete feature that will erase the content of the text communications after a period ranging from six days or shorter depending on the user's preferences. [ROA 1964]. He also testified that if you "screenshot" the text message thread prior to deletion, it will notify the user on the other side of the communication that you captured the message exchange in a photograph. [ROA 1964-65]. To circumvent this, Diaz testified he had to have a second cell phone that he would use to record a video of himself scrolling through the text-message thread on Wicker kept on the first device, and that way he could record the messages for use at trial without alerting those he was corresponding with that he was recording the conversations. [ROA 1965-1966]. After explaining this, the Government admitted Exhibits 1A-D; 2A-D; 3A1 and 2; 3B1-2; 4A1-2; 4B1-2; 4D1-2; 8A1-2; 9A-D; 10A-B; 11A-B; 12A-B; 13A-B; 15A-B; 16A-B; 18A-B; 19A-B; 20A-B; 21A1-2; 21B1-2; 22A-B; 23A-B; 24 1-2; 24B1-2; 25A-B; 26A1-2; 26B1-2; 26C; 26D; 27A-D; 28A-B; 29A-B; 20A-B; 31A-B; 33A-B; 34A-B; 35A-B; 36; 37; 38A-C; 42; 54; and 55 into evidence over the Defense objection. [ROA 709] (Defendant's written objections to Government's Exhibit List);[ROA 1966-67] (Trial objection). These admissions were curated out of approximately 254 separate

videos of Diaz scrolling through wickr communications and 277 still photographs of text messages on a cellphone. [ROA 747].

Prior to trial, the Defense filed a motion asking the court to compel the government to produce the complete set of the Wickr text messages, or a forensic download of the phone that was used by the agent. [ROA 179]. The Defense maintains that, contrary to the Agent's testimony (which he admitted was a lay opinion), the Wickr messages could easily be saved, downloaded, or extracted for review. This motion to compel was filed after specific written request to the U.S. Attorney's Office for these same materials. [ROA 181], [ROA 187]. The government declined the defendant's requests, saying it was a "fishing expedition." [Id]. In particular, the AUSA claimed that Rule 16(E) does not let the defense attorney independently seek a forensic download of the phone unless it could be shown to be material. The trial court denied the Defendant's Motion to Compel, concluding that the "form" the discovery takes is beyond the purview of Rule 16's scope. [ROA 750]. The Court also denied Lazar's Motion to Strike the exhibits. [ROA 1134].

**The Court erred in denying the Defendant's Motion to Compel, and further erred in admitting the exhibits based off agent's videos of the Wickr exchanges.**

The entire purpose of the adversarial system of criminal justice is to test the strength and quality of the government's proof such that the Defendant's presumption of innocence and proof beyond a reasonable doubt protections are scrupulously honored. Taking the Government's word that a shoddy means of document production is the best it can do does not abide by these core principles. The trial court and the

prosecution may not have felt that the production of the Wickr messages in this case was shoddy, but there is no other way to look at it in light of common sense. Not once was the government ever required to even prove up its inability to produce the messages in a more forensically sound manner, despite the defense's repeated efforts to show that Wickr was not the black hole of evidence destruction the prosecution claimed it to be.

The videos Agent Diaz recorded do not routinely overlap to show continuity. [2688] (counsel's representation that the videos don't overlap). On at least one instance, the defense pointed to communications with other alleged conspirators that suggested Diaz had spoken to Lazar via Wickr without that text being recorded in the video. [ROA 1135, Exhibit D to Motion to Strike][ROA 2671][Defendant's Exhibit 17] (related to missing text about death of Marius' Aunt]. [ROA 2766] (Agent acknowledges missing text message).  The Defense offered trade materials from Wickr indicating that data deleted from the conversation can still be obtained by search warrants to the company, which would include messages never received by the end user, date of account activation, and other items of metadata. [ROA 1135]. The Defense also offered trade articles detailing forensic extraction methods of retrieving messages off of the device that used Wickr. [*Id,* Exhibit D4].

The fundamental problem with the Government's production was best articulated by Lazar's trial counsel: 2887

> Don Flanary: When you have a word crime [conspiracy], words matter. So we need all the words. So where are all the words? . . . If my wife says I want to see your phone, I don't like the communications you are making with your secretary. Let me see your phone. I want to see all of them. I'm

31

going to let her see them. What I'm not going to do is say hold on. Let me take a video of it and scroll through and then send you them in pieces where there [are] gaps. She is not going to believe that. This is a very sophisticated [DEA] agent. Why are they using a messaging device that you can't capture? This is the United States of America . . . They have all these resources and they can't capture all of the messages?

[ROA 2887-2888] (Closing argument of defense counsel). The government and the trial court take for granted that simply because something appears to be a text-message exchange, it is sufficiently authentic to satisfy the rules of evidence. FED. R. EVID. 901(a) ("the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). But no one can simply accept Agent Diaz's word for it; not even Agent Diaz would have gone so far as to say that he can definitively represent that every single thing typed and read in Wickr was recorded. How could he? Thousands of messages with multiple individuals over months of undercover work spanning multiple continents and time zones make that type of precise certainty impossible. [ROA 2290] (discussing difficulties dealing with the time differences); [ROA 2472] (same). Marius Lazar's testimony also established that ten to fifteen texts with Diaz are missing from the production, including a message where the Agent insisted he buy ten kilos of cocaine rather than five; where Lazar expresses his desire to cancel the negotiations entirely; and one where he explains that the club members do not have weapons in Romania. [ROA 2685-86] of his correspondence with Agent Diaz was missing. [ROA 2681] (photo of cash in Euros sent to "the cartel boss" was missing]; While it is acknowledged that authenticity is not a heavy burden, it is seldom that the very method of proving authenticity calls that authenticity into question. That's what

this method of production and introduction did. This is not a case where one or two texts are being authenticated. The entirety of the message exchange between Lazar and Agent Diaz was necessary to determine whether or not Lazar was a participant in the criminal activity, the scope of his involvement, and whether or not he was engaged in the affairs of an enterprise at the time.

The trial court abused its discretion in not compelling the Government to produce the messages or the phone in a forensically viable format; and it further erred by admitting the messages over objection and denying counsel's motion to strike the exhibits. These errors prejudiced Lazar's constitutional and fundamental rights. For one, it precluded him from offering evidence in support of his claim that he withdrew from the conspiracy in a text message to Diaz, and later that Diaz threatened him to persist in doing business with him. It also prevented Lazar from being able to give the jury added context by seeking the admission of additional evidence through the rule of optional completeness, which would have not only shown the jury the full account of his correspondence with Diaz, but also shown that Diaz had failed to include those material communications in his videos which were played to the jury.

The trial court expressed confusion as to why the Defense continued to recite *Crane v. Kentucky* as a precedent in support of these objections. While *Crane* concerned itself with the operation of the rules of evidence to preclude the defendant's use of the circumstances surrounding his confession as substantive evidence at his trial, and there was no such "confession" in Lazar's case, it is important to recognize that the general

33

thrust of *Crane's* holding is that the circumstances surrounding the way in which the government secures evidence against the accused is in and of itself a relevant matter for the jury to consider as part of the Defendant's overall defense. *Crane v. Kentucky,* 476 U.S. 683, 690-91 (1986) ("[The defendant's opportunity to present a defense] would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence."). In this case, the Defense maintained that the government's method of collecting evidence and providing it to the jury made Lazar look guilty without giving it the full context. By refusing to enforce the rules of discovery, the trial court essentially permitted the government to conceal *Brady* material and circumstances of the Agent's account of events that would bear on his credibility in front of the jury. This deprived *Lazar* his right to cross-examine Agent Diaz fully, and impaired his right to rebut claims of recent fabrication with respect to his arguments for withdrawal from the alleged conspiracy and duress. This Court should reverse and remand for a new trial on this basis.

**Issue No. 4 The Government and the Trial Court deprived the Defendant his constitutional right to compulsory process and his right to confront and cross-examine by untimely disclosing the existence and relationship with a confidential, participating informant and denying the Defendant's resulting motion for disclosure under *Rovario v. United States.***

**Standard of Review.**

This Court reviews the trial court's decision to deny disclosure of a confidential informant's identity for an abuse of discretion. *United States v. Sanchez,* 988 F.2d 1384

(1993); *United States v. De Los Santos,* 810 F.2d 1326, 1332 (5th Cir. 1987). When the trial court's decision hinges on a determination of fact, those factual findings are reviewed under a "clearly erroneous" standard." *United States v. Vizcarra-Porras,* 889 F.2d 1435, 1438 (5th Cir. 1989)(citing *United States v. Maldonado,* 735 F.2d 809, 814 (5th Cir. 1984)).

**Right to Disclosure of a Confidential Informant.**

In *Rovario v. United States,* the Supreme Court recognized the need to balance the right of the accused to fundamental fairness and Due Process of Law, as well as his right to compulsory process and to present a full and fair defense under the United States Constitution against the government's interest in withholding an informant or confidential source's identity. *Rovario v. United States,* 353 U.S. 53 (1957). In so doing, the Court recognized the so-called "informer's privilege:"

> What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of the law . . . the purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation.

*Id* at 60. Although the Supreme Court acknowledges the existence of the privilege, it also notes that the privilege has its limitations. *Id.* Where the disclosure of an informant's identity, or the contents of his or her communication is relevant and helpful to the presentation of a full and complete defense, the government's privilege must yield to the Due Process rights of the Defendant. *Id* at 60-61; *United States v. Thomas,* 348

F.3d 78 (5th Cir. 2003) (court should weigh (1) the informant's level of involvement;

(2) the helpfulness of the disclosure; (3) the government's interest in non-disclosure).

**The Facts at Trial Established a Right to Disclosure of the Information about the Government's Informant:**

The trial of this case largely centered on the testimony of DEA Agent Diaz, who

navigated through a string of individuals to eventually broker a 400 kilogram cocaine

distribution deal with a group of New Zealand nationals. In the course of that

investigation, Diaz met Marius Lazar, a Romanian national who wanted to broker a

much smaller 10 kilogram cocaine purchase for distribution in Europe, as well as a

murder-for-hire plot for Romanian nationals. When Diaz began his testimony, he told

the jury that his dealings in this case started with a "tip" he received while working as

the duty agent for the DEA hotline. [ROA 1949]. The tipster identified himself as "Lee."

[ROA 1977]. That tip advised that there were individuals looking to purchase bulk

quantities of cocaine. [ROA 1950]. Diaz gave the tipster a forwarding contact number

and advised that these interested parties could contact him in an undercover capacity.

[*Id.*] Ultimately, Agent Diaz received a text message with a Chinese national

incarcerated in a New Zealand by the name of Wen Hui Cui. [3]  [*Id*]. The Agent and Cui

corresponded via the messaging app Wickr; Cui's Wicker handle was "dmted." [*Id*].

These discussions led to Diaz's introduction to Michael Murray Mattherws and Marc

---

[3] In some pleadings and filings, Appellant's counsel has mistakenly spelled "Cui's" name as "Chuy." For the purposes of this appeal, Counsel would ask the Court to accept that these names are descriptive of the same individual.

Johnson, who were New Zealand nationals. [ROA 1953]. Cui introduced Diaz to these

men to make sure they kept a fluid and effective means of communication about their

discussions with people who were not incarcerated. [*Id*].

From the many thousands of text messages exchanges Diaz had with Cui,

Matthews, Johnson, Lazar, and others, this was the Defense's understanding of how the

DEA became involved with these characters and how the investigation developed.

However, during the course of trial, it became clear that "Lee" was more than a mere

tipster, he'd actually participated in the New Zealander's negotiations with Agent Diaz.

[ROA 2182-2184] (Defense's oral motion for *Rovario* disclosure along with translation

of the letter).[4] The Government has disputed this, maintaining that Agent Diaz simply

received a DEA tip line call from Lee, and that Lee provided information that led to the

conversation between "Cui" and Agent Diaz. [ROA 910-11] (USAO mid-trial letter

divulging additional details about Lee but declining to disclose his identity or

whereabouts). But Government Exhibits 23A and 23B contained a letter from Lee to

Agent Diaz – sent via "Cui's" Wickr account -  that belies his greater involvement.

[ROA 1966-67; ROA 885 (translation of Lee's letter to Agent Diaz, aka "Don")].  In

particular, the letter details that Lee is aware of Agent Diaz's agreement with the New

Zealand conspirators ("What was agreed (90) days,") and assurances from Lee to the

---

[4] The government and court implied that this request was untimely. [ROA 2185]. The Defense
maintained that the way in which  the Wickr text discovery was tendered made it extremely difficult
to grasp the full significance of the letter until its context was explained further at trial. The Rule 16
errors are addressed separately, but in any event, the Court nevertheless ruled on the substance of the
Defendant's *Rovario* motion both at trial and in the Motion for New Trial without regard to waiver.

conspirators that Agent Diaz was a reliable drug supplier ("Also considering the possibility that the investment would disappear, I asked them not to worry. That you are 100% reliable."). The letter also suggests that Lee is a conspirator in the same conspiracy ("*We* wait for the time so that the routes are at your disposal and that in this process you are not stopping so everything continues moving forward."). In short, this letter, which was passed to Diaz via Cui's Wickr account [ROA 2149] ("Q: So it says Lee asked me [Cui] to send this letter to you. See this? Agent Diaz: Yes, sir."), shows that Lee was actively working to assure the New Zealand defendants that Agent Diaz's cocaine deal would be fruitful and that they should not be discouraged by the financial logistics of the deal.

Agent Diaz's trial testimony made clear that this exchange was sent at a moment in time when the New Zealand conspirators were concerned about arrangements Diaz had made to meet back in Bucharest with the New Zealanders in the event that funding for the cocaine was seized. [ROA 2149] (Diaz's promises to New Zealanders about his assumption of risks in event of seizure); [ROA 2149] (Discussion of Lee's letter in the context of the money the New Zealanders wired to Diaz disappearing). This necessary context prompted the Defense to urge a *Rovario* motion seeking disclosure of the identity of Lee and his relationship to the Government. The Government has insisted that, while Lee was ultimately assisted by federal authorities in obtaining parole from a New Zealand prison, he was not a participant in this case. But the Government has not contested the authenticity of the letter from Lee, and there is no other way to reasonably

interpret that document except to conclude that Lee *was* a direct participant in the drug conspiracy. There are several key features of the evidence that also militate towards this conclusion.

Lee and Chuy were both incarcerated in New Zealand. The circumstances surrounding the letter – that Chuy sent the letter to Agent Diaz on Lee's behalf – strongly indicate that Lee and Chuy were in regular, face-to-face communication and discussed the specific details of the drug conspiracy with each other. They further demonstrate the strong possibility that Chuy was aware of the content of the letter. [5] Lee was told by Agent Diaz when he called the DEA Tip Line that the Agent would not be able to assist him unless, potentially, he had a lead on any multi-kilogram cocaine distribution conspiracies. Early on in the formative moments of the conspiracy, the New Zealand conspiracy was able to wire a significant sum of money to San Francisco by way of China. No testimony was adduced to ascertain the source of these funds. Lee's letter uses the collective term "we" when referring to the attitudes of the New Zealand conspiracy as it moves forward.

The trial court denied Lazar's Motion to Disclose Lee's Identity at trial, and also denied that basis for Lazar's Motion for New Trial. [ROA at 1254]. In so doing, the Court's factual determinations appear to be not that dissimilar from what the Defense

_____

[5] The Government has suggested that there is no evidence Cui spoke Spanish or could otherwise read Lee's letter. This strains belief. Cui was in possession of a cell phone inside of a prison. If he had access to Wickr, he would also have access to the internet. A Spanish letter can be translated using Google; in some instances, this can be accomplished simply by taking a photograph of the handwritten text.

has maintained. [ROA 1254-55] ("[The letter] was likely sent at a time when Lazar's co-conspirators were concerned that their 'deal' with Agent Diaz would unravel."]. Nevertheless, the Court held that this did not make Lee an active participant in the charged offenses. This conclusion is utterly without merit, is clearly erroneous to the extent that it constitutes a factual finding at all, and as a matter of law plainly misapprehends what an "active participant" is. Lee didn't simply introduce Agent Diaz to Cui. At a critical moment in the Agent's trap for the New Zealanders' cocaine deal, Lee passed a letter of assurance to Diaz's fictional undercover identity vis-à-vis Cui to help continue the pursuit of the criminal objective. *Cf.* [ROA 2325-2326]. In short, this letter was part of the business dealings of the conspiracy. While Lee knew that Diaz was an undercover agent, Cui, Matthews, and Johnson did not; they believed that Lee and Diaz both were fellow criminals engaged in the cocaine trade. The letter is plainly not a law enforcement level communication discussing the business out-of-character. The letter is performative, and part of the actual criminal activity at issue. The trial court erred in finding otherwise.

The harm caused from this failure to disclosure is significant for several reasons. The trial did not disclose how the New Zealanders were able to finance this massive cocaine deal, nor did it explain how Cui was connected to the New Zealand Hells Angels or any other criminal enterprise. But it was established at trial that Cui had originally wanted to pay for the cocaine through China rather than the United States, and that Agent Diaz rejected this proposal. [ROA 2311]. For the purposes both of

Lazar's manufactured jurisdictional arguments, *supra,* and the material question of whether or not the New Zealand cocaine conspiracy was carried out in furtherance of the affairs of the Hells Angels enterprise, testimony about Cui and Lee's connections to China and where the money in China came from would have materially relevant to establishing that this conspiracy had nothing to do with the Hells Angels.[6] These are not speculative inquiries. The denial of the Defendant's *Rovario* motion materially impacted Lazar's constiutional rights to present a defense and to compulsory process, and it undermined the fairness of the proceedings. This Court should reverse for a new trial.

**Issue No. 5 The trial court erred in receiving expert testimony under Rule 702 from a Government witness that summarized the criminal behaviors of members of the Hell's Angels Motorcycle Club in the United States without any explanation of whether those behaviors were also applicable to the Bucharest, Romania chapter of the Hells' Angels.**

**Standard of Review.**

Rule 702 governs the admissibility of all expert testimony, even if that testimony is not "scientific" in the truest sense of the term. *United States v. Ebron,* <u>683 F.3d 105, 139</u> (5th Ci<u>r. 2012</u>). The touchstones of admissibility under this rule are whether the testimony is relevant to the questions in controversy and whether it is reliable as examined through the nature and purpose for offering the evidence. *Id.* Erroneous admission of expert testimony is reviewed under an abuse of discretion standard. *United*

---

[6] Nothing in the record suggests that the Hells Angels have a presence, either loosely confederated or strictly organized, in the People's Republic of China.

*States v. Valencia,* 600 F.3d 389, 423 (5th Cir. 2010). The ruling of the court will not be disturbed unless it is clearly erroneous. *United States v. Norris,* 217 F.3d 262, 268 (5th Cir. 2000). Such error will be subject to the harmless error rule unless it affected the substantial rights of the accused. *Norris,* 217 F.3d at 268.

**It is clearly erroneous to admit expert testimony accusing a particular organization of being a criminal enterprise when the expert did not personally employ or rely upon the work of others that employed the methodology the court found to be reliable.**

The Government relied exclusively on the testimony of ATF Specialist Eric Scheetz to establish that the Hells Angels Motorcycle Club was a criminal enterprise. The Defense objected under Rule 702 and the *Daubert* standard for expert testimony that Scheetz' testimony was neither relevant nor reliable. The court conducted a pretrial *Daubert* hearing on these objections, and permitted Scheetz to testify as an expert on the Hells Angels at trial. [ROA 1483-1639] (*Daubert* hearing); [ROA 2487-2535] (trial testimony of Scheetz).

Scheetz testified that he had extensive experience studying and investigating the Hells Angels Motorcycle Club, and as a result was intimately familiar with the organization's past history of violence, drug trafficking, money laundering, and other organized criminal activities. He also discussed the organization's rules, insignia, rituals, hierarchy, mythology, and ethos as an "outlaw motorcycle gang." He testified that his methods of synthesizing all of the historical information surrounding "HAMC" are known as the "compare and contrast" method of intelligence synthesis:

Q: So what is compare and contrast? What do you mean by that?

42

A: It means I took – I take a picture or a piece of intelligence that was either seized or we had. When I say we, I say law enforcement had before I am in possession of the new intelligence. And then, I compare it with the new intelligence, or vice versa, I compare it with intelligence that was seized or what we had obtained throughout the past.

[ROA 1505]. But none of Specialist Scheetz's underlying facts and data, disclosed at the hearing, said anything about the Romanian Chapter of the Hells Angels. [ROA 1530]. Scheetz had never visited a Romanian or a New Zealand Hells Angels clubhouse. [ROA 1532]. He did not handle or review any evidence seized from the Hells Angels in Romania in this case. [ROA 1534]. He testified he had no knowledge of whether the ethos of the American Hells Angels – often disillusioned veterans struggling to integrate back into civilian life – has any applicability to Hells Angels in Romania. [ROA 1535]. He could not say whether Hells Angels in Romania are even aware of the historical figures prominent in the Hells Angels story in America. [ROA 1537]. The trial court acknowledged these deficiencies in the expert's testimony. [ROA 1539]. But the court nevertheless permitted Scheetz to testify about the Hells Angels, just not specifically about Romania or the Bucharest Chapter or Marius Lazar.

What the trial court failed to appreciate is that Scheetz's testimony was not admissible at trial because it was not relevant, nor could his generalities about how the American chapters of the Hells Angels operate be applied to the club in Romania. There was not even evidence to establish that the Romanian charter of the Hells Angels is truly affiliated, associated, or otherwise similar other than name and insignia to the Hells Angels in the United States.

Permitting the jury to hear this testimony was catastrophic for the defense, and it had no material relevance to the facts at issue. The government needed to prove that Marius Lazar was acting on behalf of the Hells Angels criminal enterprise. To prove this, the government told the jury about a group of people in the United States without ever providing a significant linkage between those people and the motorcycle club Marius Lazar joined in Bucharest, Romania. The trial court, the prosecutors, and the police all simply acted as though this fact had been established despite the fact that the expert who synthesized the HAMC USA's history and evidence could not attest to a single point of structural, hierarchical, financial, or cultural similarity between HAMC USA and the Romanian Hells Angels.

The evidence also gave reasons why, in the absence of this "expert" summary testimony, a jury could have reasonably concluded that there was not a sufficient linkage between the groups to establish a common enterprise. As far as the rule books and "church" minutes Scheetz had reviewed concerning HAMC USA, it is clear that the Hells Angels are more of a loose confederation than a rigid top to bottom power structure. HAMC USA members are told it's a "one man, one vote" club, with each charter exercising independence from the rest. [ROA 1581-82]. Expanding to new charters does not require some written directive from a higher up group within a hierarchy. [ROA 1582]. A HAMC rule book seized in Chicago explicitly prefaced the rules with the statement "these rules are to make our life – our club life easier. If they don't work, the rules are wrong or people are wrong." [ROA 1528].

While none of Scheetz's articles of "intelligence" reference Romania, it is specious to suggest, as the Government did throughout trial, that simply choosing to associate with a group called the Hells Angels or wearing that insignia demonstrates anything approximating an "enterprise" sufficient to link all acts of racketeering perpetrated by specific members under a common banner for a RICO conspiracy. It was clearly erroneous to admit this type of evidence, especially in light of the Government's clear indication that this would be the full extent of its evidence concerning the nature of the Hells Angels as a worldwide criminal enterprise. Doing so injured Lazar's substantial rights to a fair trial by effectively lessening the Government's burden of proof, backdooring decades of hearsay in contravention of the Defendant's right to confrontation, and inviting the jury to convict on legally insufficient evidence. In essence, the testimony created an irrebuttable presumption that membership in any Hells Angels club was sufficient to establish that person as a member of a pre-existing criminal enterprise decades in the making. This Court should reverse Lazar convictions on this basis.

**Issue No. 6 The Court erred in excluding Defense Exhibit 9, which would have placed in issue whether or not Lazar was acting in furtherance of the alleged criminal enterprise.**

**Standard of Review.**

Ordinarily, the trial court's exclusion of a defense offered exhibit will be reviewed for an abuse of discretion, as outlined in the other evidentiary points of error set out in this appeal. *United States v. Age,* 136 F.4th 193 (2025). However, when the

trial court prevents the Defendant from admitting evidence that is essential to his defense, the Court will review the constitutional error *de novo*.

**Patch-in-the-Box**

The essential question for Count I of the indictment was whether or not Lazar was acting as an agent of the Hells Angels enterprise. Even if Lazar was a member of that enterprise as alleged, the Government nevertheless had to establish that his conduct was done to further the interests of that enterprise.

At trial, Marius Lazar maintained that his actions in trying to procure cocaine for sale in Europe and his solicitation to murder a Romanian national were personal matters and not part of anything he was doing for or on behalf of the motorcycle club. As evidence of this Lazar explained that he was "patch-in-the-box" at the time of the alleged conspiracy, which in the Romanian Hells Angels meant that his status as a club officer was revoked. [ROA 2629]. He was not allowed to participate in club meetings and removed from all form of club communication. [ROA 2630]. His patch-in-the-box status was related to an argument he had with another club member that does not concern the facts of this case. [ROA 2630]. In support of this claim, the Defense offered Defendant's exhibit 9, which was a 2020 email from the Romanian Hells Angels advising the membership that Lazar was patch-in-the box. [ROA 2632]. The government objected to hearsay, and the trial court sustained the objection. [ROA 2632-33]. The Defense made an offer of proof, explaining that this exhibit was essential to the defense because it showed that Lazar's actions were *ultra vires* to the objectives of

the Club. After cross-examination from the Government, the Defense again offered

Exhibit 9 on the additional basis that it rebutted a claim of recent fabrication. The exhibit

was again excluded. [ROA 2761]. The Defense made an amended offer of proof [ROA

1158].

Rule 803(3) of the Federal Rules of Evidence excludes from the hearsay

prohibition statements of a then-existing mental, emotional, or physical condition. FED.

R. EVID. 803(3)("A statement of the declarant's then-existing state of mind (such as

motive, intent, or plan."). This exclusion has been applied to written statements that

memorialize a person's understanding of a situation, the status of an individual, or the

reason why something was done. *Id*; *United States v. Esquivel, 755 F. Supp. 434, 440*

*(D.D.C. 1990)(*documents showing acquittal of co-defendant admissible to show

defendant's state of mind); *Edwards & Hanly v. Wells Fargo Securities Clearance*

*Corp.,* 458 F. Supp. 1110, fn. 2 (S.D.N.Y. 1978) (statement of former employee

showing knowledge of company's status with respect to sales volume admissible as

then existing state of mind exclusion), *overruled on other grounds* 602 F.2d 478, *cert.*

*denied* 100 S. Ct. 745 (1980).

This evidence was essential to Lazar's presentation of his defense. Lazar testified

that he was not acting in conjunction with or because of the Hells Angels when he tried

to obtain a small amount of cocaine to sell in Europe, and similarly when he solicited

the murders. In the face of the Government's attempts to impeach his credibility, it was

essential that the jury understand that Lazar's status with the club was not conducive to

conducting business on its behalf at the time of the offense. Precluding Lazar's use of Defense exhibit 9 deprived him the ability to full develop his defensive theory in front of the jury in contravention of his rights under the Sixth Amendment to the United States Constitution. *Holmes v. South Carolina,* 547 U.S. 319, 324 (2006); *Davis v. Alaska,* 415 U.S. 308 (1974). This Court should reverse.

## Legally Insufficient Evidence

**Summary and Standard of Review.**

A conviction is legally insufficient if, "viewing the evidence in the light most favorable to the Government," it is determined that no rational trier of fact could have found the Defendant guilty of that offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307 (1979); *United States v. Phillips,* 219 F.3d 404, 409 (5th Cir. 2000) (quoting *United States v. Greer,* 137 F.3d 247, 249 (5th Cir. 1998)). When this determination rests upon a question of law or the applicability of a statute, the standard of review is *de novo. Phillips,* 219 F.3d at 409 (citing *Voest-Alpine Trading USA Corp. v. Bank of China,* 142 F.3d 887, 891 (5th Cir. 1998)).

The evidence is legally insufficient to establish that Lazar conspired with anyone other than a governmental agent. It is insufficient to establish that he joined the New Zealand Hells Angels' conspiracy to import 400 kilos of cocaine into New Zealand. It is insufficient to establish that he acted in furtherance of an enterprise. It is also insufficient to show that he was a member of the criminal enterprise alleged, and that said enterprise had the requisite effects on interstate and foreign commerce. It is

insufficient to show that he joined in any money-laundering conspiracy, and further insufficient to show that venue was proper in Beaumont, Texas as to that money laundering conspiracy. The evidence is insufficient to show the requisite number of predicate acts to support a RICO conspiracy. It is insufficient to demonstrate a jurisdictional nexus for the drug trafficking conspiracy or the drug trafficking predicate under RICO.

**Issue No. 7 Fatal Variance The evidence at trial was legally insufficient to support a conviction on Counts I as it related to the drug trafficking predicates, and as to Count II – the drug trafficking conspiracy. The Government failed to prove that Lazar conspired with the New Zealand Hells Angels members; instead it proved that Lazar conspired with a federal agent, and also proved that members of the New Zealand Hell's Angels conspired with that same government agent.**

As with any conspiracy case implicating more than two alleged participants, it is incumbent on the government to establish that the conspiracy alleged in the indictment is the same as the conspiracy described by its evidence admitted at trial:

> When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass. Wholly different is it with those who join together with only a few, though many others may be doing the same and though some of them may line up with more than one group. ***Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift toward totalitarian institutions.*** True, this may be inconvenient for prosecution. But our Government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials. About them we dare not become careless or complacent when that fashion has become rampant over the earth.

*Kotteakos v. United States,* 328 U.S. 750, 773 (1946). Despite its age, *Kotteakos* remains one of the most critical decisions in federal law concerning the limits of criminal conspiracy, particularly when the nature of conspiracy alleged is of the "hub and spoke" variety. *Id* at 755 ("As the Government puts it, the pattern was 'that of separate spokes meeting at a common center,' though we may add without the rim of the wheel to enclose the spokes"). Avoiding the risks of fatal variance requires the government in such cases to establish "interdependence" between the conspirators in participating in a "collective venture directed toward a common goal." *United States v. Berger,* 224 F.3d 107, 114 (2d Cir. 2000). [7]

When a conspiracy is alleged to be a predicate act for a conspiracy to violate RICO, the problems have a tendency to multiply; this case however, presents a relatively simple application of the controlling principles. For example, in *United States v. Ruggiero,* the Second Circuit – in the same breath as it announced that *Kotteakos* would not be implicated when a RICO conspiracy necessarily comprised multiple underlying conspiracies – recognized that the Government's burden was to prove 1) that the Defendant *participated* in at least two of the predicate conspiracies, that those conspiracies constituted a pattern of racketeering, and that he conspired on those

---

[7] In juxtaposition to the concept of a "hub and spoke" conspiracy, courts often speak of the idea of a "chain" conspiracy, which has similarities with a vertically integrated business like Amazon. *United States v. Ulbricht,* 31 F. Supp. 3d 540, 553-54 (S.D.N.Y. 2014). This case is nothing like a chain conspiracy. All of the people indicted (with perhaps the exception of Lee, a Chinese National who has since died but was alleged to be the financier for the New Zealand Hell's Angels cocaine deal with Agent Diaz) was similarly situated as middle-man cocaine dealers purchasing from the same wholesale distributor (the federal agent).

predicate occasions as part of his conspiracy to participate in the affairs of the criminal enterprise. *United States v. Ruggiero,* 726 F.2d 913, 923 (2nd Cir. 1984), *overruled in part by Salinas v. United States,* 522 U.S. 52 (1997).

This analysis can be dizzying, but it is important to frame what the flaw in the Government's evidence concerns, and what it does not. The contention is not that Lazar's conviction for RICO cannot stand because there were multiple conspiratorial agreements, flat stop. Obviously, the Government is alleging that there was a conspiracy to traffic in narcotics as one conspiracy, and a conspiracy to launder money as another, each forming a predicate conspiracy to establish that Lazar conspired to assist the "Hell's Angels" enterprise in *that* specific pattern of racketeering activity. Instead, the problem with the Government's proof is that it proved the existence of conspiracies that Lazar did not join, and it also proved that Lazar, acting alone, was attempting to commit independent criminal activities in Romania. This feature of the government's proof is what makes Lazar's case unique as well as making *Kotteakos* relevant to the RICO Conspiracy, irrespective of what some circuits have said about its conceptual applicability in the RICO context. *Cf. Ruggiero,* 726 F.2d at 923;

Thus, at it's core, it is Appellant's contention that the Government failed to prove that Lazar specifically intended to join any specific conspiracy, irrespective of whether or not he was a member of the same criminal enterprise and irrespective of whether or not others within that enterprise engaged in a pattern of racketeering activity – those prongs are challenged on this appeal by way of distinct and separate issues.

The reasons why the Government's proof as to Lazar falls constitutionally short is simple – the only individual with whom Lazar agreed to perpetrate any criminal act was an agent of the United States, working in an undercover capacity, and as a matter of law cannot form a conspiratorial agreement. This is a fundamental proposition of conspiracy law, often termed the "*Sears*" rule, after a 1965 decision from this Court. *United States v. Delgado,* 672 F.3d 320, 363 fn. 19 (5th Cir. 2012) (citing *United States v. Corson,* 579 F.3d 804, 811 (7th Cir. 2009); *United States v. Paret-Ruiz, supra; United States v. Carlton,* 442 F.3d 802, 811 (2nd Cir. 2006); *United States v. Nunez,* 889 F.2d 1564 (6th Cir. 1989); *United States v. Barboa,* 777 F.2d 1420, 1422 & fn. 1 (10th Cir. 1985); *United States v. Escobar de Bright,* 742 F.2d 1196, 1199 (9th Cir. 1984); *United States v. Tombrello,* 666 F.2d 485, 490 fn. 3 (11th Cir. 1982); *United States v. Moss,* 591 F.2d 428, 434 fn. 8 (8th Cir. 1979); *United States v. Chase,* 372 F.2d 453, 459 (4th Cir. 1967); *Sears v. United States,* 343 F.2d 139, 142 (5th Cir. 1965)) (Dennis, J. Dissenting).

The simple fact that others may have assisted the government agent in advancing the criminal objective the defendant agreed to with the government agent does not, by itself, mean that the fictional conspiracy became a real one. Agent Diaz testified that Matthews offered to contact Lazar to find out whether Lazar could pay for his ten kilograms of cocaine in cash. [ROA 2087-2088]. Agent Diaz testified that, in his mind, Matthews and Lazar were one-and-the-same; but nothing factually bears that out. In reality, Diaz held parallel conversations with both men, and it is readily apparent that

Lazar's cocaine deal was his alone; so much so that Diaz backed him into a corner trying to find baroque and creative ways for Lazar to secure the payment for the cocaine. [ROA 2117] ("Q: Why do you [Agent Diaz] send him a picture of a white tiger? A: . . . I asked him if he knew anybody who wanted to buy a white tiger to see if I could make up the money that way."). While Diaz indicated he'd be willing on good faith to "put [Lazar's cocaine] in the water [i.e. ship it] with [the New Zealander's cocaine]," the record makes it clear that these transactions are separate and paid for separately, irrespective of Diaz's mere conclusory assertion that Lazar and the New Zealand purchasers are "the same." [ROA 2117-18].

For the New Zealand Angels to be part of the agreement between Lazar and the federal agent, it is not sufficient that they are aware of the agreement.

**Issue No. 8 The evidence was legally insufficient to establish that Lazar was a member of the criminal enterprise alleged and was also insufficient to establish the commerce element as required for a RICO Conspiracy as alleged in Count I of the First Superseding Indictment.**

### "Relationship plus Continuity"

The first superseding indictment alleged that the criminal enterprise at issue was "the Hells Angels." [ROA 1373]. It further stated that "At all times relevant to this First Superseding Indictment, the Hells Angels operated throughout the United States including the Eastern District of Texas, as well as internationally in countries including New Zealand, Romania, and Germany." [*Id*]. The import of this pleading is clear – the Government was required to prove that the motorcycle clubs calling themselves "the

Hells Angels" in each of these localities were part and parcel of the same discrete enterprise.

"RICO regulates enterprises, not people." *Waucaush v. United States,* 380 F.3d 251, 255 (6th Cir. 2004). The predicate offenses' impact on commerce is not the question; the issue is whether the *enterprise* itself affects commerce. *Id* (citing *United States v. Crenshaw,* 359 F.3d 977, 984 (8th Cir. 2004)). Under the Sixth Circuit's treatment of the issue, a RICO prosecution must establish that the enterprise in question had an economic effect of interstate or foreign commerce that was "substantial." *Waucaush,* 380 F.3d at 257. The First Circuit has split from the Sixth on this question, concluding that RICO touches enterprises that are inherently non-economic. *United States v. Nascimento,* 491 F.3d 25 (1st Cir. 2007). It does not appear that this Circuit has weighed in directly on this question.

The Sixth Circuit's view is more consistent with ensuring that there are *some* limitations on Congress' ability to bring generalized non-economic criminal activity within the purview of federal law. *See United States v. Lopez,* 514 U.S. 549, 560 (1995) (Congress' authority to regulate commerce must be tied to the movement of commerce, the specific commodities in commerce, or activity that "substantially affects" commerce).

The jury instructions in this case told the jury that an enterprise engages in commerce if it "directly engaged in the production, distribution, or acquisition of goods or services in interstate or foreign commerce." [ROA 2822-23]. It further instructed

them that an enterprise's conduct affected interstate or foreign commerce if the conduct had a demonstrated connection or link with such commerce." [ROA 2823]. But the proof at trial utterly failed to establish anything about the commerce effects of the Hell's Angels Motorcycle Club generally, much less whether the Romanian Hell's Angels participates in that same pattern of commerce, shares in the proceeds of its American counterparts, or has ever had more than a purely incidental effect on foreign commerce. The testimony of ATF Intelligence Operations Specialist Jeremy Caulton Scheetz – the Government's sole witness for discussing the nature and parameters of this so-called "enterprise" – never used the word "commerce" once in the entirety of his trial testimony. [ROA 2487-2536]. He discussed how local clubs sometimes have fund-raising events to help post bail for members, although this testimony was plainly couched in terms of American charters of the Hell's Angels, and even then only in a generalized way. [ROA 2502]. He Explicitly acknowledged having no underlying facts or data to support his "belief" that the Romanian Hell's Angels operates in any way like its American counterpart. [ROA 2517-18]. Asked about whether individual members of the Hell's Angels have committed economic crimes such as drug trafficking or money laundering, Specialist Scheetz answered in the affirmative. [ROA 2499]. He further acknowledged, through leading questions on direct examination from the Government, that the global network of Hell's Angels members – a network he could not and was not permitted to discuss in the more specific context of Romania –

benefitted members who engaged in drug dealing. [ROA 2502].[8]

The testimony of Agent Diaz was similarly generalizing, but intended to be interpreted as a specific description of the Romanian Hell's Angels' criminal enterprise without substantive proof of same. Diaz recounted conversations with New Zealand HAMC member Matthews where Diaz asked about the methamphetamine supply in New Zealand. [ROA 2093-94]. He also asked Matthews about the state of prostitution and strip clubs. [ROA 2083]. When asked to clarify, Diaz spoke generally about the use of sexually oriented business as a means of laundering cash. [*Id*].    None of this testimony spoke to what the Romanian Hell's Angels were doing, if they were engaged in such racketeering activities, or whether they were connected in any way to the criminal behaviors Matthews referenced. The Defense's objections to relevance on these questions were overruled [ROA 2107]. Thus, the Government's only evidence of a commerce connection to the activities of the Hell's Angels generally or specific to Romania came in the form of clarifying the purpose behind Agent Diaz's intelligence gathering efforts. Knowing why a policeman asks a specific question does not prove, by either direct or circumstantial evidence, the truth behind what that policeman is investigating.

But none of this testimony established that the Hell's Angels Romania were engaged in any sort of economic criminal activity. Apart from its arguments and the

---

[8] In what would be a recurring theme, the Defense objected to the Government's attempt to tacitly imply the application of what may be generally true about the American Hell's Angels to the specifics of Romania. The Court overruled this objection. [ROA 2502].

speaking indictment, the Government never established whether, when individuals who happen to be members of the American Hell's Angels commit drug or money laundering crimes, those offenses are international, interstate, or intrastate.

The government's rationale is flimsy logic, and it invites the trier of fact to do more than merely link logical inferences. It calls upon the jury to elide otherwise unconnected premises until they see what the Government wants them to see. It isn't competent evidence of a criminal enterprise; it's conspiracy thinking in the popular culture's use of the term. Anyone who is a member of a group can benefit from their relationships in that group to commit crimes. A member of a college fraternity, a rock-and-roll fan club, or even in tragic cases a public official could conceivably derive personal criminal benefit from the friends and connections he or she makes with other like-minded people that share that bond of membership. The fact that alumni of Phi Gamma Delta, devoted fans of the Grateful Dead, and even members of the United States Senate have historically committed economic criminal activities does not establish that such organizations are criminal enterprises affecting interstate or foreign commerce, much less that they do so "substantially" when some out of many perpetrate criminal acts.

## Issue No 9. Venue was Improper for Lazar's Money Laundering Conspiracy

Proper venue for a criminal prosecution is a Constitutional Right of the accused, and Venue must be proper as to each count of a multi-count indictment. U.S. CONST. art. III, § 2, cl. 3 ("[S]uch Trial shall be held in the State where the said Crimes shall

have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."); U.S. CONST. Amend. VI ("impartial jury of the State and District wherein the crime shall have been committed . . ."); FED. R. CRIM. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."); *see also United States v. Bowens,* 224 F.3d 302, 308 (4th Cir. 2000) ("When a defendant is charged with multiple counts, venue must be proper on each count." (citing *United States v. Smith,* 198 F.3d 377, 382 (2d Cir. 1999))).

These principles hold equally true for all substantive criminal offenses, including money laundering. As the constitutional and statutory framework explicitly states, only in the event that a crime does not have a geographic dimension does the Congress have the power to set the appropriate venue for the offense. The *actus reus* of a money laundering offense – whether charged under Section 1956 or 1957 – is the financial transaction itself, not the specified unlawful activity that the transaction was designed to promote or conceal. *United States v. Rodriguez-Moreno,* 526 U.S. 275, 280 n. 4 (1999) ("The existence of criminally generated proceeds was a circumstance element of the offense but the proscribed conduct – the defendant's money laundering activity – occurred "'after the fact' of an offense begun and completed by others.'" (quoting *United States v. Cabrales,* 524 U.S. 1 (1998))). The Supreme Court's decision in *Cabrales* squarely establishes, at least for substantive money laundering counts, that venue for a money laundering charge cannot piggy-back on the locus of the specified

58

unlawful activity. *Cabrales,* 524 U.S. at 8.

Congress sought to codify the reasoning and dicta of *Cabrales* when it subsequently enacted 1956(i) in 2001. This provision declares that a money laundering case may be brought in "any district where a prosecution for the underlying specified unlawful activity could be brought, ***if the defendant participated in the transfer of proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.***" 18 U.S.C. § 1956(i)(1)(B). The statute further authorizes venue for charges of conspiracy to violate Sections 1956 and 1957 if venue would be proper in that district for a completed offense or in any district where an act in furtherance of the conspiracy took place. 18 U.S.C. § 1956(i)(2). This statutory scheme makes it clear that the specified unlawful activity ("SUA") is functionally irrelevant to the question of proper venue in a money laundering case *unless* the SUA is coupled with a financial transaction from the locus of the SUA to the "district where the financial . . . transaction is conducted," or, in cases of conspiracy, where an overt act in furtherance of the conspiracy took place. *United States v. Villarini,* 238 F.3d 530, 533-36 (4th Cir. 2001) ("the mere fact that proceeds were criminally generated in a particular district is not sufficient, standing alone, to establish proper venue in that district for a charge of laundering the money.").

**Standard of Review.**

This is a sufficiency of the evidence claim. Consequently, the Court must, reviewing the evidence in the light most favorable to the Government, determine

whether any rational trier of fact could have found venue properly lied in the Eastern District of Texas by a preponderance of the evidence. *United States v. Solis,* 299 F.3d 420, 444-45 (5th Cir. 2002).

**The extraterritorial jurisdiction requirements preclude the Court from adopting the Government's Reading of Section 1956(i) as a permissive, rather than a mandatory venue statute**

This case involves an extraterritorial application of the money laundering conspiracy statute which, despite the absence of an overt act requirement in Section 1956(h), requires the Government to prove the jurisdictional element of the crime by demonstrating an overt act in furtherance of the conspiracy:

> (f) There is extraterritorial jurisdiction over the conduct prohibited by this section if— (1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and
> (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

18 U.S.C. § 1956(f) (extraterritorial jurisdiction). This provision is critical to the analysis. The Government's argument at trial was that Section 1956(i) is simply a permissive venue section expanding the number of places where a money laundering conspiracy can be tried and that, consequently, the government was at liberty to bring the money laundering case to Beaumont, where it alleges Lazar was "first brought" under 18 U.S.C. § 3238. But the phrase "trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular state or district," in the context of money laundering's specific extraterritoriality provisions, defeats the government's argument. Money laundering "overseas or elsewhere," is not a federal

60

crime unless the strictures of Section 1956(f) are first satisfied. Thus, the offense was neither "begun" nor "committed" until an overt act in furtherance touched American shores. Once that triggering event occurred – the wiring of funds to an American bank account – the entire purpose for applying Section 3238 falls away. There is no need, and in fact it smacks of impermissible forum shopping, to randomly pick a district based on where an airplane lands when the actual crime charged contains a specific venue provision that explicitly sets the venue in the location where the monetary transaction was conducted.

In this case, it must be recalled that there was no drug kingpin in Beaumont, Texas. That entire narrative was a fiction devised by Agent Diaz to manufacture a reason to prosecute these foreigners in the United States. The record conclusively establishes that all of the financial transactions supporting Lazar's conviction for conspiracy to commit money laundering – and that underpin money laundering as a RICO predicate under Count I – were conducted in Houston, Texas (S.D. Tex.) and San Francisco (N.D. California). [ROA 2055].  The trial court recognized this based on the trial testimony and expressed concerns about Beaumont as the venue for the money laundering conspiracy, but ultimately sided with the Government on the belief that Section 3238 controlled over the specific venue language of Section 1956(i). This was clearly in error. Despite the exceedingly low burden of proof attendant to the question of venue, the evidence conclusively establishes that venue was not proper in the Eastern District of Texas as to Count III of the First Superseding Indictment. This issue will be

analyzed further in the Jury Instructions section of the briefing, as it relates to the court's failure to properly instruct the jury on the governing venue law for Count III.

**The trial court committed reversible error by failing to instruct the jury on the correct venue statute for Count III**

When the trial testimony squarely places venue at issue, the trial court commits reversible error by failing to instruct the jury on the governing law concerning venue. *United States v. White,* 611 F.2d 531, 536-37 (5th Cir. 1980) (citing *Green v. United States,* 309 F.2d 852, 856-57 (5th Cir. 1962). This holds especially true when the Defendant requested the jury to be properly instructed. In this case, the Defense requested the jury to be properly charged on venue for the conspiracy to commit money laundering. That request was denied, and the Defense objected to the Court's failure to properly instruct the jury. [ROA at 2785].

For all of the reasons recited in the preceding point of error, the Court improperly instructed the jury that it could find that venue for Count III lied in the Eastern District of Texas if the jury found by a preponderance of the evidence that Beaumont was the place where Lazar was "first brought" within the United States.  As a discrete jury charge error built on the same issue, the Court similarly failed to instruct the jury that, for the federal government to have jurisdiction over the case, an overt act in furtherance of the money laundering must have occurred in the United States [ROA 2797-2801]. The Court should reverse and render an acquittal as to Count III. Alternatively it should reverse and remand Count III for a new trial.

## The Jury Charge

**Standard of Review.**

A preserved objection to the constructive amendment of the indictment through the jury instructions is reviewed *de novo. United States v. McMillan,* 600 F.3d 434 (2010).

**Issue 10. The court's instructions constructively amended the indictment by inviting the jury to find the existence of the enterprise simply by virtue of the existence of the alleged conspiracy. *Cf. United States v. Keller,* 916 F.2d 628, 636 (11th Cir. 1990).**

**Association in Fact Instruction.**

The indictment alleged that Lazar and the other defendants were engaged in the affairs of an association-in-fact – the Hells Angels Motorcycle Club. "The enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." [ROA 1377]. The jury instructions at pages 14 and 15 told the jury that "common sense dictates that the existence of an association in fact enterprise is sometimes more readily proven by what it does rather than by abstract analysis of its structure." [ROA 2787]; [ROA 2821]. The Defense objected to this language on the basis that it invited the jury to find the existence of the enterprise solely by virtue of finding that the defendants conspired together. [ROA 2787-88]. The indictment's insistence on the Hells Angels' hierarchical structure places this case in the first category of cases governed by the concept of a pattern "beyond that inherent in the pattern of racketeering activity" that

the Supreme Court addressed in *Boyle*. *Boyle v. United States,* 556 U.S. 938, 947 (2009).

The jury charge language here amended the indictment by authorizing the jury to find Lazar guilty of Count I based solely on whether or not there was a conspiracy to engage in the alleged pattern acts, rather than requiring the jury to independently find the existence of the enterprise alleged. This deprived Lazar of his Sixth Amendment right to indictment by grand jury and lessening the government's burden by excusing a failure of proof on an essential element of the RICO Offense – the independent enterprise requirement.

**Issue 11. The Court's instructions impermissibly lessened the Government's burden of proof on Count I by turning one drug transaction into six constituent parts, thereby expanding the number of predicate offenses the jury could consider when determining whether the RICO conspiracy had reached an agreement on the requisite number of predicate offenses.**

The indictment sets out three predicate acts of racketeering – a drug trafficking conspiracy; a money laundering conspiracy; and a murder-for-hire plot. Both through the court's constructive amendment of the murder-for-hire into a conspiracy to violate Section 848(e)(1)(A), and more globally through Page 20 of the jury instructions, the court constructively amended the indictment by breaking the drug trafficking predicate down into five constituent predicates: import, export, manufacture, conspiracy, and 848(e)(1)(a) killing. [ROA 2828]. The defense objected to this instruction as a constructive amendment. [ROA 2791-92].

Albeit in dicta which has been cited with disapproval in other circuits, the decision in *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.* out of the Northern

District of Illinois pointed out that carving up a predicate act into several constituent parts is not appropriate in a RICO prosecution. *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F. Supp. 828, 834 (N.D. Ill. 1985) ("It merits observing that even if the three added kickback payments alleged . . . involved the use of the mails, they still implemented the *same* fraudulent scheme as the first two mailings – and the single scheme does not appear to represent the necessary 'pattern of racketeering activity.'"). This case is simply a starting point in the analysis. Other decisions with stronger precedential value than what trial counsel announced in the objection have recognized that a pattern of activity requires continuity, and that to be continuous, "the predicate acts must be ongoing over an identified period of time so that they can be fairly viewed as constituting separate transactions." *Morgan v. Bank of Waukegan,* 804 F.2d 970, 976 (7th Cir. 1986). *Boyle* also appears to disapprove of this carving approach:

> Proof that a defendant conspired to commit a RICO predicate offense – for example, arson – does not necessarily establish that the defendant participated in the affairs of an arson enterprise through a pattern of arson crimes. Under § 371, a conspiracy is an inchoate crime that may be completed in the brief period needed for the formation of the agreement and the commission of a single overt act in furtherance of the conspiracy. [RICO] demands much more . . . the actual commission of a pattern of predicate offenses.

*Boyle,* 556 U.S. at 950.

The same conduct constituting the drug conspiracy is alleged in Count II of the Indictment, but it would be violative of Double Jeopardy for the Defendant to have been convicted of each constituent piece of the conspiracy simply because the overarching drug trafficking conspiracy allegedly obtained agreement to import, export, and

manufacture/distribute. Particularly in a case where the conspiracy is the only actual crime – i.e. the predicate is by definition inchoate, the court cannot carve up the agreement into multiple predicate acts to establish the pattern. The Court erred in so instructing the jury. This Court must reverse.

**Issue 12. The court improperly charged the jury on the legal concept of attempted transports of monetary instruments in ts instructions on Count III. [ROA 2837]. This constitutes a double inchoate offense, and it is not a criminal offense authorized by law.**

18 U.S.C. Section 1956 criminalizes attempts to launder monetary instruments as well as completed acts of money laundering. Subsection (h) of 1956 also criminalizes conspiracies to violate any of the provisions of Section 1956. The money laundering conspiracy statute does not have an overt act requirement.  It is axiomatic of substantive criminal law that a conspiracy requires an agreement with the specific intent that the object offense be completed. It is, thus, extremely bizarre to suggest that one can be guilty of agreeing to take substantial steps toward completing the object offense but failing to do so. *Cf. United States v. Mandujano,* 499 F.2d 370 (5th Cir. 1974) (generally defining federal criminal attempt).

This Circuit has previously considered such a formulation for conspiracy to attempt and rejected it. *United States v. Meacham,* 626 F.2d 503, 509 (5th Cir. 1980). Admittedly, *Meacham* focuses on the statutory construction of Sections 846 and 963 of Title 21, in which attempts and conspiracies are proscribed in the same paragraph. In 1956, attempts are listed in the substantive offense section, (a)(2)(A), while conspiracies

to violate any of the offenses in Sections 1956 or 1957 are enumerated in subsection (h) of Section 1956. But this feature of Congress' organizational style does not seem to detract from the basic force of *Meacham's* holding, that Congress did not intend to create substantive crimes, conspiracies, attempts, *and* conspiracies to attempt.

The Defense objected to this instruction on the basis that it was a double inchoate offense that was not authorized by law. The trial court overruled the objection. [ROA 2797-2801]. This was clearly in error. The Court should reverse Lazar's conviction on Count III.

## SENTENCING

The trial court calculated Lazar's guidelines at a total offense level of 43, Criminal History category of I, which provides for an advisory guideline range of life imprisonment. Because of the Government's promise to the international court of human rights in exchange for Lazar's extradition, the Court indicated it would not impose a life sentence. [ROA 2993-94]. The Government requested a sentence of 300 months or 25 years. [ROA 3002]. The Court then imposed a sentence of 300 months as to Counts I and II, and a sentence of 240 months as to Count III, all to run concurrently. [ROA 3002]. The Defense objected to the trial court's calculation of the guidelines, as set forth in its objections to the presentence report [ROA 7867 – 7877], as well as to the overall sentence imposed. [ROA 3012].

**Issue 13. The Court incorrectly calculated Lazar's drug quantity relevant conduct.**

Assuming the evidence is legally sufficient to convict him of this conspiracy at

all, Marius Lazar is only personally responsible for 10 kilograms of cocaine. The probation department calculated Lazar's drug quantity based on 420.1 kilograms of cocaine, which resulted in a drug quantity base offense level of 36. [ROA 7872]. This is clearly in error because this Circuit has long recognized that the "foreseeable" conduct of co-conspirators for which the accused can be held accountable as relevant conduct looks to the future actions of the conspiracy, not those matters which occurred prior to the actors decision to join the conspiracy. *United States v. Carreon,* 11 F.3d 1225, 1236 (5th Cir. 1994) ("We hold today that 'relevant conduct' as defined in § 1B1.3(a)(1)(B) is prospective only, and consequently cannot include conduct occurring before a defendant joins a conspiracy."). The trial court, in a factual finding that is clearly erroneous, stated that Lazar joined the conspiracy before the 400 kilogram conspiracy between Diaz and the New Zealanders was completed. [ROA 2929-30]. But this is simply not true. The agreement, which is the only requirement under Section 963 for a narcotics conspiracy, was finalized prior to Lazar's introduction to Diaz, and prior to him joining the conspiracy.

Lazar should have only been held accountable for the 10 kilograms of Cocaine he actually agreed to purchase from Agent Diaz. This would have placed his base offense level on drug quantity at a level 30, rather than a level 36. USSG § 2D1.1.

**Issue 14. The Court incorrectly calculated Lazar's Role in the Offense.**

The Court applied a three-level adjustment for a leadership role in the offense. [ROA 2984]. There is no evidence to support this adjustment. Lazar is objectively the

least culpable offender of the conspiracy in terms of its overarching objectives. Lazar sought hundreds of kilos less than the New Zealand co-conspirators. He was introduced to Agent Diaz by the New Zealand members after they had brokered the much larger 400 kilogram cocaine deal with the Agent. Lazar clearly lacked access to the funding resources of the New Zealand conspirators, and never personally wired any money to the United States. Lazar should have received no upward adjustment for his role in the offense.

**Issue 15. The Court incorrectly calculated Lazar's money laundering offense level as a proceedings case rather than as a promotion case, which is what he was indicted and convicted of.**

Paragraph 51 of the presentence report incorrectly calculated Lazar's offense total for money laundering at level 40 using USSG § 2S1.1(a)(1). This is not the appropriate guideline because this is not a proceeds money laundering case. The only evidence received concerning the source of the funds was Lazar's testimony that he legally borrowed the funds in order to purchase the cocaine offered by Agent Diaz. [ROA 2579]. The government never offered an alternative explanation for the funds. In fact, the Government never even speculated about the source of Lazar's funds, because that would have been utterly unnecessary to prove a promotion-based Section 1956 money laundering conspiracy. There is simply nothing in the record to support this calculation. The Indictment certainly does not allege, and there was no evidence produced at trial to suggest, that the money used to purchase the cocaine from the UC was derived from the underlying offense. On the contrary, according to Count III of the

indictment, the money was derived legally to "promote the carrying on of specified unlawful activity." As a result, subsection (a)(2) of 2S1.1 should apply. This results in an offense level calculation of 8 plus 10 from the theft valuation table of Section 2B1.1. Then six levels should be added pursuant to subsection (b)(1), and 2 levels pursuant to subsection (b)(2)(B), bringing the offense level to a total of 26.

The trial court's calculation of the guidelines is clearly erroneous, misapplies the law and the guidelines, and grossly inflated the total sentence imposed. Had the court applied the guidelines correctly, the recommended sentence on Counts I and II would have been a level 30, and a level 26 on Count III; resulting in a sentence of 97-121 months on Counts I and II, and a sentence of 63-78 months on Count III. Thus, if the Court does not reverse Lazar's convictions to render acquittal on all counts, and it does not reverse his convictions to remand for new trial on all counts, the Court should nevertheless vacate Lazar's sentences on all three counts and remand for resentencing.

## CONCLUSION

The Government's indictment is grossly overreaching, seeking to attach through fiction, duplicity, and artifice an interpretation of extraterritorial jurisdiction that violates Due Process of Law and defies Congress' intent. The Court's rulings on the Defendant's challenges to the indictment, coupled with its instructions to the jury further unlawfully amended the indictment. The court's rulings on evidence deprived Marius his right to present a defense, and allowed the jury to convict on misleading and irrelevant evidence. The evidence is legally insufficient on all counts to sustain his guilt.

His sentence was grossly in excess of what the guidelines should have called for. His convictions should be reversed.

WHEREFORE, PREMISES CONSIDERED, Appellant prays this Honorable Court to reverse and render acquittal on all counts. In the alternative, Appellant prays this Court to reverse and remand for new trial on all counts. In the alternative, Appellant prays this Court to vacate his sentences on all counts and remand for resentencing. Appellant finally prays for all other relief this Court deems fit in law or in equity.

Respectfully submitted,

 /s/ *John T. Hunter*
State Bar No 24077532

HUNTER, LANE & JAMPALA
711 Navarro Street
Suite 235 – Travis Park Plaza
San Antonio, Texas 78205
(210) 202-1076
(210) 880-6162 (*telecopier*)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 22, 2025, a true and correct copy of the above corrected brief on appeal has been served on the United States Attorney's Office for the Eastern District of Texas via the Court's ECF electronic filing platform, which transmits notice and service to all parties of record.

/s/ <u>*John T. Hunter*</u>
State Bar No 24077532

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief contains 18,471 words, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32(a)(7)(B)(iii)</u>.

2.      This brief complies with the typeface requirements of <u>Fed. R. App. P.</u> <u>32(a)(5)</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because it has been prepared in a proportionally spaced typeface using Microsoft Word software in Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes.

3.      This brief complies with <u>5th Cir. R. 31.1</u> because it has been converted into Portable Document File (PDF) format.

<u>/s/ <em>John T. Hunter</em></u>
State Bar No 24077532
